# Commonwealth *v.* Wasson, Appellant.

*Criminal law—Conspiracy—Participation in conspiracy.*

1. While it requires more than proof of mere passive cognizance of a crime on the part of a defendant to sustain a charge of conspiracy to commit it, yet if a conspiracy has been entered into by other parties without the defendant's knowledge or participation in it, and he becomes a party to it while it is still in life, he may be convicted.

*Criminal law—Bribery—Councilmen—Impossibility of the crime to be committed.*

2. If three councilmen of a city and two outsiders confederate to procure the passage of ordinances through councils by the gift or promise of bribes to enough members for that purpose, the bribe money to be furnished by the two outsiders to one of the three councilmen and to be distributed by him among those voting for the ordi-

nances, the substantive crime of conspiracy is committed by the three councilmen, although the two outsiders secretly intend not to furnish the bribe money but to frustrate the full execution of the conspiracy.

*Criminal law—Bribery—Councilmen—Conspiracy.*

3. Councilmen of a city who have entered into a conspiracy to accept bribes for passing certain ordinances, cannot defend against the charge of conspiracy on the ground that they had been lured into the act by detectives proposing to them a scheme which the detectives had no intention or ability to carry out.

4. In considering the question of public policy the clear distinction, founded on principle as well as authority, is to be observed between measures used to entrap a person into crime in order, by making him a criminal, to aid the instigator in the accomplishment of some corrupt private purpose of his own, and artifice used to detect persons suspected of being engaged in criminal practices, particularly if such criminal practices vitally affect the public welfare rather than individuals.

*Criminal law—Conspiracy—Coconspirators—Detectives—Evidence.*

5. Where detectives enter into a combination with conspirators in order to discover, arrest and punish the conspirators, and they continue to act in such capacity in good faith until the conspirators are arrested, the testimony of the detectives is not to be considered as the testimony of coconspirators.

*Practice, C. P.—Trial—Mistake in charge—Inadequacy of charge.*

6. Where the trial judge makes an inaccurate statement of some particular part of the testimony in the course of his charge, the counsel for the party aggrieved should call the judge's attention to the unintentional slip before the jury retires and have it corrected.

7. It is only in exceptional cases, as, for example, where it plainly appears that the charge is so inadequate as to be misleading, or where by indirection, it withdraws the attention of the jury from material issues or evidence, or from matters entering as necessary elements into the decision of the question at issue, or where its tendency as a whole is to unduly magnify the importance of the proofs introduced by one party and to belittle those introduced by the other party, that the court will be reversed upon general exceptions.

*Practice, C. P.—Trial—Jurors—Prejudice.*

8. On the trial of an indictment for conspiracy to take a bribe for passing a particular ordinance, jurors who have previously tried and convicted two of the conspirators on another indictment for conspiring to take a bribe in connection with another and different ordinance, are not disqualified, where they testify positively that they had

formed no opinion as to the guilt or innocence of the defendants of the conspiracy charged in the particular indictment being tried.

Argued Oct. 26, 1909.   Appeal, No. 24, April T., 1910, by defendants, from judgment of Q. S. Allegheny Co., Feb. T., 1909, No. 136, on verdict of guilty in case of Commonwealth v. J. C. Wasson.   Before RICE, P. J., HENDERSON, MORRISON, HEAD, BEAVER and PORTER, JJ.   Affirmed.

Indictment for conspiracy.   Before FRAZER, P. J.

At the trial the following motions were made:

Mr. Burleigh: Before the challenging begins in this case, if the court please, the defendants object to any jurors who were impaneled and sworn in the case of Commonwealth against William W. Ramsey or the case of the Commonwealth against John F. Klein, for the reason that they of necessity have an opinion in this case and could not give the defendants, or either of them, a fair trial under the evidence.

The challenge is overruled.   To which ruling of the court, counsel for defendants request an exception.   Exception allowed and bill sealed. [4]

Mr. Burleigh: If the court please, counsel for all the defendants now move to strike out the entire testimony of Robert Wilson upon the stand, for the following reasons:

1. The testimony in this case now shows that the defendants were not, and could not have been, guilty of any conspiracy under the common law or under the statutes of the commonwealth of Pennsylvania.

2. That no unlawful act was intended or proposed, but the whole of the alleged unlawful act was a subterfuge and a pure invention.

3. That no crime was intended or contemplated, or was possible.

4. That no crime was even attempted or intended to be attempted.

5. That no person and no body corporate, and especially the municipal corporation of the city of Pittsburg, was not intended to be defrauded, and could not have been defrauded.

6. The whole of the testimony heretofore given is now

shown to be a fabrication and invention and a subterfuge, in order simply to obtain information in regard to an entirely different transaction, viz.: the selection of the six national banks for city depositories, for a term of four years from February 1, 1909.

7. The testimony proves at most that the defendants were willing to do an unlawful act that was never intended to be done and was not in contemplation.

The Court: It seems to me that if there was a conspiracy here, it was complete upon the agreement of the parties to commit the offense charged, without regard to whether there was any overt act to carry it out, or whether there was an intention on the part of the witness for the commonwealth to do as charged in the indictment. The motion to strike out is refused.

Exception noted and bill sealed for defendants. [5]  ·

Defendants presented these points:

7. That inasmuch as it appears by all of the evidence produced by the commonwealth that the entire scheme concerning which the conspiracy in this case is alleged was one never intended to be carried into effect, and which never could have been carried into effect, and was a mere fake scheme devised by the detectives in the case to test the willingness of the defendants to commit an unlawful act, there can be no conviction of the defendants or any of them. *Answer:* Refused. [6]

8. That there is no sufficient evidence in the case to warrant the jury in convicting the defendants, or any of them, of a conspiracy to carry out the scheme suggested and devised by the detectives. *Answer:* Refused. [7]

9. That, under the pleadings and evidence, the jury ought to acquit the defendants. *Answer:* Refused. [8]

11. That the evidence of an accomplice, coming as it does from a polluted source, should be received with great caution, and closely and doubtingly examined by the jury; and in considering such testimony the evidence of the good character and reputation of the defendants is of special importance for the consideration of the jury. *Answer:* As that request is written, we cannot affirm it as a whole, but as a general proposition it is

correct. You will first determine, as I said in the general charge, whether the detectives who testified in the case were accomplices, and if they were accomplices, then you will treat their testimony as that of accomplices and weigh it as such, and if they were not accomplices, you will treat it as you treat the testimony of other witnesses; considering, of course, in the final determination, the evidence in regard to good character. [9]

The court charged in part as follows:

[It has been argued to you that they were guilty of an offense—assuming their testimony to be true—that they were guilty of bribery, and they ought not to be believed; that the law does not sanction acts of that kind. The law does sanction acts of that kind, and in regard to that, I want to read you what our Supreme Court has said in reference to the testimony of witnesses acting as the witnesses for the commonwealth acted in this case. . . . Apply that to this case. If these detectives were acting in good faith in this matter; if they came here for the purpose of detecting corruption in councils; if they were ascertaining whether there was corruption in councils; if their purpose was detecting crime and dishonest acts upon the part of councilmen, then I say to you they ought not to be regarded as accomplices or coconspirators.] [18]

[The Court: Gentlemen of the jury, I have received from you a communication asking for instructions as to the bearing of the testimony of certain witnesses upon the part of the commonwealth. If you will indicate to me upon just what portion of the testimony you desire any further instructions, I will be very glad to give it to you.

The Foreman: The first three witnesses of the commonwealth.

The Court: Wilson, Jones and Huffling?

The Foreman: Yes, sir.

The Court: In what respect?

The Foreman: The strength of their evidence.

The Eighth Juror: Its credibility.

The Court: That is entirely for you gentlemen to determine.

The value of their testimony depends upon whether or not they were acting in good faith. As I understand the law, if these three detectives came here and went to the two hotels for the purpose of ascertaining whether or not members of councils were guilty of corrupt practices, and invented the scheme of wood paving, the scheme for putting a wooden pavement upon the streets of the city, for the purpose of detecting crime or dishonest practices in councils, then you will treat their testimony just as you would that of any other witness, give it the credit that you think it is entitled to receive, weighing it, as you would the testimony of any other witness. If, however, they were not acting in good faith; that is, if they were not honestly endeavoring to ascertain whether there were corrupt practices amongst councilmen, but were there for the purpose of inducing councilmen to join with them in having ordinances passed for the purpose of defrauding the city, or for other corrupt and dishonest purposes, then they would become accomplices of the three defendants, and you should weigh their testimony and treat it as you do that of an accomplice.] [19]

[I gather from the testimony that either the law or a rule of councils requires resolutions for repaving to be first presented in councils, referred to the finance committee and the finance committee acts upon them, and if they approve the resolution they return it to councils; if passed by councils, it is then referred to the director of public works for estimates. That, I believe, was done in this case; the resolution was presented by the defendant Klein, was referred to the finance committee of which the defendant Wasson is chairman, returned to councils, passed by both branches of councils, and then certified to the director of the department of public works, who made an estimate, and that is as far as the matter has gone; before anything further can be done the money intended for repaving the street must be provided by councils.] [24]

[On the 16th, about 1 o'clock, Wasson again came to the room of Wilson, and there, among other things, they discussed as to whether Ramsey was a proper man to participate in the matter, Wilson saying that he had understood that Ramsey

had been drinking at one of the clubs in the city, and that Wasson said he didn't think so, and then Wilson says they began to talk about the bank deal, about the ordinance designating the bank depositories, and Wilson says Wasson informed him that money was paid by the different banks to be selected as depositories, and that the money was pooled and paid out afterwards to members of councils; that it was put in a safe deposit vault by one of the members of councils and remained there some time—I believe he said a month—and after that it was taken out and distributed.] [25]

[All the members of the committee and the city clerk and his stenographer testify to that fact, while Director Lang says that he remembers both Brand and Klein being at the committee meeting, but whether they left the room or not he does not know; that he would not say they did or did not; that he was present in the interest of certain employees in his department; that he was interested in the meeting of the committee, and that they could have gone out and come in without his noticing.  If the two defendants were at the City Hall during that entire evening, were not out of City Hall, of course they did not get the money as testified to by the witnesses upon the part of the commonwealth, and if they did not get the money, if the men who were in the Hotel Duquesne testified falsely in that matter, they testified falsely to a material fact in this case, and it discredits their testimony to such extent as you think it should.  While, on the other hand, if Brand and Klein were at the Hotel Duquesne and got money from Jones, and now say they did not get it, the fact of their denying it discredits their testimony, if they have sworn falsely in regard to the matter; and it is a matter that you may consider very carefully in determining the value you will give the balance of their testimony.] [26]

Verdict of guilty, upon which judgment of sentence was passed.  Defendant appealed.

*Errors assigned* among others were (4, 5) rulings as above, quoting the bill of exceptions; (6–9, 18, 19, 24, 25, 26) above instructions, quoting them.

*Clarence Burleigh* and *Henry G. Wasson,* for appellant.—
Assuming that the indictment upon which the appellant was
tried, was legal, and that the facts as shown do impute crime,
the nature and character of the testimony offered by the com-
monwealth will not sustain a conviction: Saunders v. People,
38 Mich. 218; University of Michigan v. Rose, 45 Mich. 284;
Connor v. People, 18 Colo. 373 (33 Pac. Repr. 159).

Assuming that the indictment was legal and that the facts
as shown at the trial impute a crime, in any aspect of the case
as presented, Wilson and his associates were coconspirators,
accomplices in the perpetration of the crime, and the learned
court erred in its ruling and, therefore, the conviction cannot
be sustained: Campbell v. Com., 84 Pa. 187; State v. McKean,
36 Iowa, 343; Com. v. Hollister, 157 Pa. 13.

The evidence offered by the commonwealth was not suf-
ficient to connect this appellant with the conspiracy charged
in the indictment, and the learned court below should have di-
rected his acquittal.

The charge of the court was misleading, prejudicial and
generally unfair to appellant.

*Warren I. Seymour,* with him *W. A. Blakeley,* for appellee.—
Appellants were guilty of the crime of statutory conspiracy:
Com. v. Zuern, 16 Pa. Superior Ct. 588; Com. v. Brown, 23
Pa. Superior Ct. 470.

The following authorities seem to us to indicate that solicita-
tion to commit a new crime does not constitute an illegal trap:
Reg. v. Williams, 1 C. & K. 195; United States v. Wight, 38
Fed. Repr. 106; United States v. Grimm, 50 Fed. Repr. 528;
Com. v. Baker, 155 Mass. 287 (29 N. E. Repr. 512); People v.
Noelke, 94 N. Y. 137; People v. Molins, 10 N. Y. Supp. 130.

OPINION BY RICE, P. J., March 3, 1910:

The defendants in the indictment involved in this appeal
were John F. Klein, William Brand, J. C. Wasson and W. W.
Ramsey. The first three were convicted and Ramsey was ac-
quitted. The first count of the indictment charged a con-
spiracy to cheat and defraud the city of Pittsburg out of its

money, goods, chattels and other property, and "to do other dishonest, malicious and unlawful acts to the prejudice of the city of Pittsburg," contrary to the form, etc. The second count charged a conspiracy to cheat and defraud the city of Pittsburg and to do certain acts, involving bribery of the defendants and other councilmen, relative to the paving of streets of the city of Pittsburg with wood block. We need not attempt to set forth more in detail the substance of the charges of this count of the indictment since the facts tending to establish them are recited later in this opinion. The third count was substantially the same as the second except it did not charge a conspiracy to cheat and defraud and did not conclude against the statute.

At the time of the alleged conspiracy, Klein, Brand and Wasson were members of common council, Brand being president of that body and ex officio member of all its committees, and Wasson being chairman of the finance committee. During the same period Robert Wilson was employed as a detective by the Voters' League, a voluntary organization having for its purpose, amongst others, the promotion of the business-like, honest and efficient conduct of the public offices within the city of Pittsburg, the thorough investigation and discussion of the conditions and details of the city administration therein, the promotion of the choice of competent officials and the encouragement of the faithful performance of public duties. According to a fair and legitimate interpretation of the commonwealth's testimony, the general purpose for which Wilson was employed was the investigation of the previous passage of ordinances and measures through councils by bribery of councilmen, of which there had been rumors, particularly the ordinances designating six banks as depositories of city moneys and the obtaining of evidence of such corrupt practices on the part of councilmen. Wilson took with him for the purpose for which he was employed two other detectives, Herbert W. Jones and T. S. Huffling, and Wilson reported from time to time to the president of the Voters' League what he was doing. In the beginning of the negotiations which the commonwealth alleges culminated in the conspiracy, Jones

represented to Klein and Brand that he was claim agent or adjuster for the U. S. Lumber Co., that he came from Scranton in the interest of the company for the purpose of creating a market for the product of the company, and that he desired to have a street or streets designated in Pittsburg for wood block pave. Wilson was introduced to the defendants and held himself out as a Mr. Dolph, a retired director of the U. S. Lumber Co., and as acting in the interest of that company. These subterfuges were kept up throughout the entire negotiations, the facts being that neither Jones nor Wilson was authorized to represent the U. S. Lumber Co., and that the U. S. Lumber Co. had no desire or intention to furnish or to contract to furnish to the city of Pittsburg or its contractors wood block for paving. Between November 7 and December 14, 1908, according to the commonwealth's testimony, numerous separate interviews took place between Jones and Klein and Jones and Brand, and between Wilson and Klein and Wilson and Brand, and three interviews between Wilson and Wasson. Up to November 16, 1908, these interviews were had in either one or the other of two adjoining rooms in the Duquesne Hotel, rented by Jones and Huffling, the door between them being perforated by gimlet holes through which what took placd in one room could be seen and heard in the other. To illustrate: When the first interview between Jones and Klein in room 102 took place, Wilson and Huffling and Williams were in room 101 looking and listening through the holes in the closed door. On and after November 22, 1908, the interviews took place in one or the other of three rooms in the Fort Pitt Hotel arranged in substantially the same way for looking and listening. The testimony as to what took place and was said at each of these separate interviews with Klein, with Brand and with Wasson was given by the person with whom the interview was had and by the persons (either Wilson or those acting in conjunction with him in the detective work) who were in the adjoining room looking and listening in the manner above described. We shall not undertake to recite in narrative form the testimony as to the details of what was said and done at all of these interviews, but it will be necessary later to refer in some de-

tail to.the interviews between Wilson and Wasson, this appellant. Leaving out of view for a moment the fact that Wilson and Jones, unknown to the defendants, were acting as detectives .only, the testimony taken as a whole was sufficient to warrant the jury in finding that Klein, Brand, Wilson and Jones confederated and agreed substantially as follows: First, to procure by bribery of councilmen the adoption by councils of a resolution designating a part of Fourth avenue as a street to be paved with wood block, it being part of the agreement that Wilson or the company he claimed to represent should pay $3,000 to be distributed among councilmen for their votes and influence in that matter; second, to procure from time to time in the future the passage of ordinances for the paving of other streets with wood block, and the making of appropriations therefor, and to that end, (a) to obtain the control of councils · by the nomination and election of members who would "go along in the future"—that is, who would stand by the measures that Klein, Brand and their associates should introduce in councils for wood block paving, it being part of the agreement that Wilson or the U. S. Lumber Co. would contribute $500 as campaign expenses to secure the nomination and election of each of such councilmen; (b) to establish a fund, to be contributed by Wilson or the U. S. Lumber Co. out of which there should be distributed to councilmen for their votes and influence in favor of such resolutions and ordinances fifteen per cent of the value of each contract let for wood pave; third, as incident to the general scheme, to form a corporation to put down wood block pave in the city, the persons actually interested in and controlling the corporation to be Klein, Brand and other members of council, their names, however, not to appear on the books of the corporation, but to have substituted therefor the names of other persons who would act as dummies.

We have thus far spoken of the sufficiency of the evidence, if believed by the jury, to connect Klein and Brand with the alleged conspiracy. As to that there is scarcely room for a dispute. It is now necessary to consider the very earnest contention that it was not sufficient to connect Wasson, this ap-

pellant, with it. The first interview between Wasson and Wilson took place December 14. It is true that at that time the resolution to pave Fourth avenue with wood block, which had been drafted by Klein or someone at his instance, had passed both branches of council. But no contract had been let. The latter fact is of some importance, as will be seen from the following summary of Wilson's testimony relating to his direct communications with Wasson and what led up to them. At Wilson's interview on December 13 with Klein, as in his previous interviews with Klein and Brand, Wilson expressed the opinion that it was important that he see Wasson, who had been described to him by Klein as "one of the Big Six" who controlled legislation, as one who could be "reached," as "one of us," as one who would "go along," as "one of the boys," who were getting uneasy to have the $3,000 matter settled. It was arranged that Wasson was to come to see Wilson. On the following day, Klein brought Wasson to Wilson's room and after introducing them left the room. In the conversation that ensued relative to wood block pave (we are not undertaking to state the facts but only what Wilson testified as facts) Wilson asked him if he knew about the Fourth avenue pave and Wasson replied that he did, that he knew about the conferences that had been taking place but did not know all of the details of the plan that was to go through. Wilson says he then told him of the $3,000 to be paid for putting through the Fourth avenue pave, also of the fifteen per cent, also of the $500 to be put up for the nomination and election of candidates. Thereupon Wasson made the suggestion, which Wilson approved, that Wilson put up $200 at the primaries and the balance of the $500 at the election. Wasson then asked whether Wilson desired to have the Fourth avenue resolution go through that year. Wilson replied that he did because if it went through then the next administration would not be in position to kick about wood paving. Wasson said that was a good idea. Later in his testimony Wilson says he told him they were to pay $3,000 for the Fourth avenue matter, that Ramsey was to get the money in the future and he was to give it to Klein and Klein was to distribute it. To that Wasson (we now quote

from Wilson's testimony) "suggested that it would be a good idea not to trust everything to one man, and so immediately after this I took out some money from my pocket, and I counted out three $100 bills, and I handed it to Mr. Wasson, and he took it and thanked me, and I said I wanted him to take care of this resolution in the future, when it came up in the finance committee, and especially during the contract— when the contract was to be let—and he assured me that he would stand by the measure when it came up." Wilson further testified that after he gave him the money the following took place: "After he thanked me and assured me and said it was all right, that he would take care of it, he then looked around and he said, 'Is everything all right here?' Q. How did he look around? A. He looked all around the room and at the doors, and I said, 'Well, this is the bathroom door. That is locked.' And I said, 'This door here leads to the next room, and I have that room.' Then I went to the closet door— clothes closet—and opened that door and said, 'This is the clothes closet.' I said, 'It's all right.' And he then assured me that he would stand by in the future and take care of the legislation for us." Again, Wilson testified that Wasson said that it would be better for Klein not to be the only man to know all about the details of this matter, and that after talking about other parties, he gave Wilson his telephone number and told him how to reach him any time he wanted him. The next interview was on December 16 when, according to Wilson's testimony, Wasson came to his room alone. The specially significant features of Wilson's testimony relating to what took place at that interview are, that Wilson asked Wasson about the method that was used in putting through the bank deal, and told him that Ramsey, Klein and Brand had "agreed to have matters put through by us in the future in the same manner;" that Wasson said the money paid to put through the bank deal was pooled, and about a month after the ordinance was passed the person having charge of the money "divided it up and accounted for every penny of it to us;" that in reply to Wilson's inquires, Wasson admitted that he had seen Klein about the Fourth avenue matter, that Klein had

taken him in on the fifteen per cent scheme, and that he understood that the money Wilson and those he claimed to represent were to pay—"the $500 for election purposes and the money for the Fourth avenue pave and the fifteen per cent for all future legislation"—was to be handled by Ramsey and Klein was to go to him to get the money. In affirming the defendants' second point the learned trial judge correctly instructed the jury that it requires more than proof of mere passive cognizance of a crime on the part of a defendant to sustain a charge of conspiracy to commit it; and the jury must find that the defendant did some act or made some agreement showing an intention to participate in some way in such conspiracy. The evidence alluded to and other testimony of the same purport and corroborative of it tends to show more than mere passive cognizance on Wasson's part of a conspiracy that had been entered into; if believed by the jury it warranted them in finding that he became a party to it while it was still in life. If so, it would not be a defense to say that the whole scheme was concocted, and that one overt act towards carrying out part of it had been committed, before he became an accomplice: Com. v. Bartilson, 85 Pa. 482; People v. Mather, 4 Wendell, 230.

It is argued that the criminal acts which it is alleged were the subjects of the confederation or agreement were impossible of performance and therefore the confederation or agreement was not an indictable offense. Obviously this contention cannot be sustained on the theory that it was inherently impossible for these defendants, in the expectation of receiving the promised bribes, to introduce ordinances and resolutions for the paving of other streets than Fourth avenue with wood block, and to secure their adoption by their votes and influence. Wilson and Jones were not members of councils, they could not introduce the ordinances and resolutions and they could not vote for them; their co-operation in that way was not essential to the consummation of the plan. The supposed impossibility to commit the criminal acts, which it is alleged the defendants confederated and agreed to commit, must rest, therefore, on the fact that neither Wilson nor Jones nor those they claimed to represent intended to apply for contracts to

furnish wood block to carry out the ordinances that might be passed, or to contribute money for the nomination and election of councilmen who would vote for the passage of the ordinances, or to establish a fund out of which there should be distributed to councilmen for their votes and influence in favor of such ordinances fifteen per cent of the value of each contract let for wood pave. This fact, however, does not deprive the confederation or agreement of the defendants of any element essential to their conviction of the crime of conspiracy. In Pennsylvania the gist of the offense of conspiracy is the unlawful confederacy to do an unlawful act, or to do a lawful act in an unlawful manner; and as no overt act is necessary to complete it, none need be laid: Collins v. Com., 3 S. & R. 220; Com. v. McKisson, 8 S. & R. 420; Hazen v. Com., 23 Pa. 355. The overt acts do not constitute the offense; they are the evidence of it, and are sometimes said to be the aggravation of it: Com. v. Bartilson, 85 Pa. 482. "It has been repeatedly ruled that in order to render the offense complete, there is no occasion that any act should be done, or that anyone should be aggrieved or defrauded in pursuance, or in consequence of the unlawful agreement:" Heine v. Com., 91 Pa. 145. It follows from the application of this principle that if three councilmen and two outsiders confederate to procure the passage of ordinances through councils by the gift or promise of bribes to enough members for that purpose, the bribe money to be furnished by the two outsiders to one of the three councilmen and to be distributed by him among those voting for the ordinances, the substantive crime of conspiracy is committed by the three councilmen, although the two outsiders secretly intend not to furnish the bribe money but to frustrate the full execution of the conspiracy.

While the commonwealth's testimony shows that not all of the details for carrying out the general plan were suggested by the detectives, but some of them were suggested by the defendants, yet it must be conceded that the particular conspiracy charged in the indictment would not have been formed had it not been for the expressed desire of the detectives to have streets designated for paving with wood block, and the

deception and subterfuges resorted to by them to induce be-
lief in the minds of the defendants that the real purpose for
which they desired the ordinances and resolutions to be passed
was to secure a market for the product of the U. S. Lumber Co.,
and that the defendants would receive bribes for their official
action in bringing about the legislation.  It is to be observed,
however, that no deception or subterfuge was resorted to, to
induce belief in the minds of the defendants that the part they
were to perform in carrying out the general scheme would not
be criminal, as on its face it plainly was.   Interpreting the
verdict in the light of the evidence and the judge's instructions
to the jury, it must be admitted for purpose of the present dis-
cussion that the defendants corruptly confederated to pass
ordinances through councils, or at least to combine their votes
and influence for the passage of ordinances, in the expecta-
tion of bribes which they had agreed to accept and to share
among themselves and others.   As already pointed out every
essential element of a criminal conspiracy was present when
they entered into this confederation.   Upon what ground,
then, can it be claimed that the fact, that they would not have
confederated had it not been for the deception and subter-
fuges resorted to and the promises made by the detectives,
constitutes a defense?   Certainly not upon the ground that
if the defendants had performed the acts to be performed by
them they would have been disappointed in their expectation
of receiving bribes therefor; nor upon the ground that the
commonwealth is estopped by any action of its officers; nor
upon the ground that the detectives' consent to acts which
were to be performed by the defendants would have deprived
their acts, if performed, of any essential element of criminality;
nor upon the principle upon which it has been held in some
cases to be no burglary where a servant to whom a scheme of
burglary has been proposed tells his master or the police, and
while apparently confederating with the burglar acts with the
knowledge and advice of his master and lets the thieves into
the house by opening the door.   If there is any ground upon
which the facts as to the part the detectives took in the forma-
tion of the conspiracy can be held to be a defense, it is upon

the ground of public policy, and it is strenuously contended that an acquittal should have been directed for that reason. In general, one who has committed a criminal act is not entitled to be shielded from its consequence merely because he was induced to do so by another. There has been much discussion in the courts of this country and by the text-writers as to the relation of detectives to crime, and many of their methods have been severely denounced. A few exceptional cases can be found where upon grounds of public policy the courts have refused to sustain convictions because of the abhorrent methods adopted to lure the accused into crime. Upon the other hand there are many cases wherein the courts, while in some instances condemning the methods employed by the detectives, have sustained the convictions, although the particular crime charged would not have been committed had it not been for the deceptions or subterfuges or the suppression of the truth resorted to by the detective. It has been held that one accused of selling liquor in violation of an ordinance cannot defend on the ground that the city furnished a person with money to buy liquor in order to detect violation of the ordinance: Evanston v. Myers, 172 Ill. 266. See also Com. v. Baker, 155 Mass. 287. Indeed in every case in which a detective solicits the sale of liquor to him by an unlicensed person in a sense instigates the crime involved in that particular sale, and yet that fact will not shield the violator of the law. A familiar instance is the use of decoy letters. In Grimm v. United States, 156 U. S. 604, it was held that the federal statute was violated by the defendant, he having placed letters in the post-office which conveyed information as to where obscene matter could be obtained, with a view of giving such information to the person who should actually receive those letters, no matter what his name, and that the fact that the person who wrote for such obscene matter under an assumed name was a government detective in no manner detracted from the defendant's guilt. Brown, J., said: "The officer, suspecting that the defendant was engaged in a business offensive to good morals, sought information directly from him, and the defendant, responding thereto, violated a law of the United States

by using the mail to convey such information, and he cannot plead in defense that he would not have violated the law if inquiry had not been made of him by such government official." So also it has been held to be no defense for the mailing of obscene publications that they were sent to a government inspector in response to his decoy letters asking for them: Andrews v. United States, 162 U. S. 420; Price v. United States, 165 U. S. 311. The same doctrine has been laid down in prosecutions for stealing decoy letters in which money has been placed in such manner as to indicate that it was there: United States v. Wight, 38 Fed. Repr. 106; also as to the purchase of a lottery ticket for the purpose of detecting and punishing the vendor: People v. Noelke, 94 N. Y. 137. In People v. Liphardt, 105 Mich. 80, the defendant was convicted of receiving a bribe upon an agreement to vote for the adoption of a certain school desk at a prospective meeting of the board of education of which he was a member. On writ of error the theory was set up that he was entrapped into the commission of the act through a conspiracy between Atcherson, the main witness for the people, the mayor of the city and the police, and the evidence tended strongly to show that the defendant was entrapped into the agreement. The judgment was reversed and a new trial ordered upon the ground of error in restricting cross-examination, but in the course of the discussion of the contention that he was decoyed, the court said: "We know of no case that holds that one who has committed a criminal act should be acquitted because induced to do so by another." Again the court said: "If the facts were shown as stated, the defendant cannot excuse the receipt of money as a consideration for promised official action merely because he was solicited by Atcherson, even if it were done at the instigation of the officers of the city who have no right to compromise justice in any such way." This would seem to be a refutation of the conclusion which counsel for appellant seek to draw from some of the obiter remarks of MARSTON, J., in Saunders v. People, 38 Mich. 218. In People v. Conrad, 102 App. Div. (N. Y.) 566, affirmed by the court of appeals in 1905, it appeared that the County Medical Society, believing that the

defendant was guilty of performing abortions, obtained a decoy to solicit defendant to perform an abortion upon her. She paid the plaintiff a sum of money and requested him to come to her house which he did, and was arrested in the act of attempting to perform the abortion. HATCH, J., said: "The conviction was brought about by means of a trap arranged by the officers of the County Medical Society. It is claimed that as the defendant was lured into the commission of the claimed overt acts, he cannot be punished therefor. This contention has recently been the subject of examination by this court and by the court of appeals and decided adversely to the contention of the defendant. He was not a passive instrument in the hands of the entrapping parties. He did the act with which he was charged, voluntarily, with full knowledge of the subject and of the consequences that would flow therefrom." Under such circumstances, setting a trap by which he was caught is not a defense." See also People v. Krivitsky, 168 N. Y. 182. In People v. Mills, 178 N. Y. 274, it was held that taking up court records from the place where they have been laid, and walking away with them with intent to destroy them, are overt acts which render one guilty under a statute making the unlawful removal of such records a crime, although they were taken from a place where they had been placed by direction of the district attorney (who had no authority to consent to their removal) for the purpose of detecting defendant in the commission of the crime. This case supports the proposition before stated that the detectives' feigned consent to the acts to be performed by the defendants does not detract from their criminality. VANN, J., speaking for the majority of the court said: "When it was found that the defendant took into his possession the property of the state with intent to steal it, an offense against public justice was established, and he could not insist as a defense that he would not have committed the crime, if he had not been tempted by a public officer whom he thought he had corrupted." An examination of a large number of cases shows that in most of them in which the fact that the alleged criminal act was incited by another for the purpose of detecting and punishing the person incited to it has been held to be

a defense, it has been because the consent of the person against whom or against whose property the crime was intended to be committed took away from the act one of the essential qualities of the crime charged. Connor v. People, 18 Colo. 373, relied on by appellant's counsel, is such a case. We need not stop to consider whether the case is in entire harmony with Com. v. Hollister, 157 Pa. 13. Even conceding the correctness of the decision in the Colorado case, namely, that persons cannot be convicted of conspiracy to commit larceny if they merely adopt a scheme which is suggested to them by a detective and which has received the approval of the owners of property, the principle is not applicable here. Again, in considering the question of public policy the clear distinction, founded on principle as well as authority, is to be observed between measures used to entrap a person into crime in order, by making him a criminal, to aid the instigator in the accomplishment of some corrupt private purpose of his own, and artifice used to detect persons suspected of being engaged in criminal practices, particularly if such criminal practices vitally affect the public welfare rather than individuals. Without declaring that under no circumstances ought the courts to direct an acquittal of a crime clearly proved upon the ground that the accused was entrapped into it by immoral and illegal detective methods, we are quite clear that there is enough evidence that the purpose was to secure the conviction and punishment of those suspected to be engaged in criminal practices to bring this case within the second class above mentioned, and that the court did not err in refusing to direct an acquittal upon the ground of public policy.

The next question to be considered is as to the correctness of the court's instructions relative to the weight to be attached to the testimony of the detectives. The general test to determine whether a witness is or is not accomplice is—Could he himself have been convicted either as principal or accessory? In Hazen v. Commonwealth, 23 Pa. 355, it appeared that the defendants were convicted under an indictment charging them with having entered into a conspiracy to "solicit, induce and procure" certain persons, stated to be officers of a bank, to

violate sections of a statute prohibiting under penalty the circulation in Pennsylvania of foreign banks notes of less denomination than $5.00. On writ of error, which as the law then stood did not bring up the evidence, the judgment was affirmed, but in discussing the nature of the defendants' acts LEWIS, J., said: "If the object was merely to detect and bring to punishment suspected violaters of the law, there was nothing indictable in the transaction. Norden's Case, in Foster's Crim. Law, 129, and many other cases in detecting post office larcenies and other offenses are instances of this." In the case of Campbell v. Commonwealth, 84 Pa. 187, the trial judge, after referring to the theory of the commonwealth as to the existence of a secret organization for the purpose of committing crime, and of the right of the government in such cases to protect itself by employing detectives to enter the organization, and expose its criminal acts and bring the guilty to punishment, charged as follows: "We therefore say to you that if McParlan came into the coal region as a detective, for the purpose of getting into the organization known as, or called, the 'Molly Maguires' and if he actually did join it, and gave information to the persons who employed him, and to the officers of the law, as to crimes committed, or that were about to be committed, and he continued there honestly, in that capacity, for the purpose of ferreting out and exposing and bringing to punishment criminals, he was not an accessory before the fact to those crimes, nor was he a co-conspirator in the eye of the law, so long as he honestly carried out the original purpose for which he entered there, and although he may have encouraged and counseled parties who were about to commit crime, if, in that, his intention was they should be discovered, arrested and punished for such offense. Therefore, if you find that McParlan came here for that purpose, and that in good faith he was such detective, continuing to remain such while he kept with the organization, then he does not stand in the light of an infamous witness, and, therefore, his testimony is to be treated just as you treat the testimony of every other witness who comes to the stand—that is to say, give to it such weight and consideration in your

deliberations as you believe it is entitled to in the particular case." It is thus seen that the test given to the jury by which to determine whether McParlan was an accomplice and his testimony should be weighed as such was not whether the design to commit the particular crime had its origin in his suggestion, nor whether McParlan was cognizant of the fact that Jones was about to be murdered and that men had been selected and sent to murder him, but whether in counseling and encouraging parties who were about to commit crime he was acting as a detective with the intention that they should be discovered, arrested and punished. His intention and motive rather than the extent of his ostensible participation in the criminal confederacy were made the test. In overruling the assignments relating to the subject Justice STERRETT speaking for the Supreme Court said that, "though a great degree of objection or disfavor may attach to such, they are not to be regarded as accomplices." In Commonwealth v. Hollister, 157 Pa. 13, it was held that the defendant could be convicted of larceny on the following state of facts: The defendant planned a robbery, the execution of which was intrusted to three other men. Brown, one of the confederates, informed the police, and it was arranged that he should co-operate with the others in the commission of the crime and report to the police. The paymaster who was to be robbed was informed of the plot, and consented not to resist the robbers. The three confederates went to the pay office, covered the paymaster with a revolver, and ordered him to hold up his hands. Brown and one of the other confederates then seized, bound, blindfolded and gagged him. They then took the money from the office, and as they were leaving they were surrounded by the police and arrested. The pertinency of the decision to the assignments now under discussion arises out of the clear implication of the opinion of the Supreme Court that if the facts relative to the intention of Brown in participating in the crime were as above stated, his testimony was not to be treated as that of an accomplice. In his answer to a point put by the defendants, the learned trial judge in the present case affirmed the general proposition therein

stated, namely, "That the evidence of an accomplice, coming as it does from a polluted source, should be received with great caution, and closely and doubtingly examined by the jury," but coupled it with the instruction that it was for the jury to determine whether the detectives were accomplices. In his general charge, as well as in his answers to questions propounded by jurors, he instructed the jury as to the test to be applied in determining the question. Viewing these instructions as a whole we are of opinion that they were warranted by the Pennsylvania decisions.

There was ample evidence given by the commonwealth's witnesses to warrant the jury in finding that the conspiracy expressly contemplated the putting through of the wood pave scheme in the same manner as the bank deal. We have alluded to some of the testimony to that effect, and there was more of the same kind. It was therefore competent to show by the admissions of the defendants the methods adopted in the latter, and it was none the less competent because these admissions showed that the methods were criminal.

The portion of the charge complained of in the twenty-fifth assignment relates to the defendants' allegation that Klein and Brand were present at a committee meeting in the city hall at the time, and for some time before and after, they were alleged by the commonwealth to have been in the Duquesne Hotel and to have accepted bribes of $500 each. The complaint is that the learned judge in reviewing the testimony regarding this allegation belittled the testimony of the defendants' witnesses—that he passed over the testimony of the witnesses who were positive that Klein and Brand were present during the whole session of the meeting and dwelt wholly on the testimony of Lang. This criticism is not well founded. The learned judge said: "All the members of the committee and the city clerk and his stenographer testified to that fact," that is, as shown by the context, that Klein and Brand remained in the room during the entire session of the committee—"while Director Lang says that he remembers both Brand and Klein being at the committee meeting, but whether they left the room or not he does not know;

that he would not say they did or did not; that he was present in the interest of certain employees in his department; that he was interested in the meeting of the committee, and that they could have gone out and come in without his noticing." This review was quite as favorable to the defendants' contention as the testimony warranted. A separate review and analysis of the testimony of each of the defendants' witnesses would not have presented the cases more favorably.

The instructions embraced in the twenty-fourth assignment are criticised because the court assumed that the evidence showed that the Fourth avenue resolution was referred to the finance committee of which Wasson was chairman. In answer to this criticism counsel for the commonwealth point to the testimony of Pierce C. Williams to the effect that at one of the interviews Klein said that this ordinance had gone through councils but was now in the hands of the finance committee, and to the testimony of Mr. Shepherd, Director of the Department of Public Works, to the effect that when the resolution reached him on November 19, in the regular course of transmission from the clerk of councils to the department, he made an estimate and sent it on November 21 to the city controller as clerk of the finance committee for the consideration of the committee. In view of this testimony, it is proper to say that if there was any inaccuracy in the judge's description of the course that the resolution took, and the defendants deemed it important, their counsel ought to have called his attention to the unintentional slip before the jury retired and had it corrected. Commonwealth v. Razmus, 210 Pa. 609; Penna. R. R. Co. v. Donora Southern R. R. Co., 219 Pa. 361; Biehl v. General Acc. Assurance Corp., 38 Pa. Superior Ct. 110, are some of the later cases which sustain our conclusion that they could not hold it in reserve to reverse the judgment in the event of an adverse verdict.

It is claimed that the court erred in its charge to the jury by giving great prominence to the evidence produced by the commonwealth and in stating all of the alleged incriminating facts against the defendant at length, and in not stating or reviewing the testimony offered on behalf of the defendant

to the same extent. In the same connection counsel lay great stress on the judge's omission to refer to the meeting of December 21 when Wasson was arrested. The extent to which a trial judge ought to go in reviewing, analyzing and commenting on testimony depends very largely upon the circumstances and nature of the case, and, to some extent, upon the line of argument pursued by counsel in addressing the jury. Generally it must be left to his sound discretion. It is only in exceptional cases, as, for example, where it plainly appears that the charge is so inadequate as to be misleading, or where by indirection, it withdraws the attention of the jury from material issues or evidence, or from matters entering as necessary elements into the decision of the question at issue, or where its tendency as a whole is to unduly magnify the importance of the proofs introduced by one party and to belittle those introduced by the other party, that the court will be reversed upon general exceptions of this nature: Blank v. Barnhart, 17 Pa. Superior Ct. 214; Commonwealth v. Penrose, 27 Pa. Superior Ct. 101, and cases there cited. We are wholly unable to agree with the learned counsel that the testimony for the defendants was slighted and that for the commonwealth was magnified in the judge's charge. We are of opinion that it was neither one-sided nor inadequate, and that the exceptional cases where there have been reversals upon either or both of these grounds do not control this case. The remarks of Mr. Justice MITCHELL in Commonwealth v. Kaiser, 184 Pa. 493, may be appropriately quoted as a complete answer to the argument of appellant's counsel upon this branch of the case. "It is complained that here and there items that bore in favor of the prisoner were not specially mentioned. It is probable that the commonwealth might make the same complaint. It is not possible nor even desirable that the judge should refer to and emphasize every item of evidence on both sides in a way that the counsel would consider adequate. In doing so he would run much risk of coming to speak as an advocate rather than a judge. Nor is he required to go over all the evidence on any particular point every time he refers to the point in the course of his

charge. It is enough if he gives to the jury a general review of the evidence on the one side and the other, which fairly and adequately presents the respective contentions of the parties, with enough reference to the items of evidence to assist the jury in recalling it as a substantial whole, and to appreciate its bearing."

Before the challenging of jurors began the defendants objected to four jurors who had been impaneled and sworn in the case of Commonwealth v. Klein and the case of Commonwealth v. Ramsey in which respectively the charges were giving and accepting a bribe in connection with the ordinances designating banks as city depositories. Such of the jurors as were examined on their voir dire testified quite positively that they had formed no opinion as to the guilt or innocence of the defendants of the conspiracy charged in the present case. If, therefore, the overruling of the objection to the four jurors was error, it is because they must be deemed in law to have prejudged the case by their verdicts in the bribery cases. We think this is not necessarily to be implied as a matter of law merely because evidence might be introduced in the conspiracy case concerning the matter involved in the bribery cases; for it is observable that the conspiracy charged was not a conspiracy to pass the bank ordinances by bribery. The case is quite different from one where the juror has formed an opinion from having sat as a juror, or from hearing or reading the evidence, in a former trial of the same case. The question it seems to us was virtually decided in Commonwealth v. Toth, 145 Pa. 308, where it was held that a juror, called on the trial of an indictment for murder, committed during a riot, and testifying that the preceding week he served as a juror on the trial of an indictment for the riot, on which the defendant and others were convicted, but had formed no opinion as to the guilt or innocence of the defendants of the murder charged was not thereby disqualified. The decision is so directly in point that it seems unnecessary to prolong this opinion by an extended review of other cases.

The questions raised by the assignments alleging error, (1)

in refusing the motion to quash and in requiring the defendants to go to trial upon the indictment, upon the ground that this was not a proper case for permitting a district attorney's bill to be sent before the grand jury, (2) refusing the defendant's demand for a full panel, one jury having been selected and sent out in another case, (3) in the rulings respecting the use of memoranda by witnesses to refresh their memory, have been fully considered in the opinions herewith filed in Commonwealth v. Klein, No. 21, April Term, 1910, post, p. 66, and Commonwealth v. Ramsey, No. 26, April Term, 1910, ante, p. 25.

The contention that the learned judge erred in his answer to the question propounded by one of the jurors as to the nonproduction of the stenographic notes alleged to have been taken by two of the witnesses is not well founded. These stenographic notes were not the best evidence, but could only be used by the witness to refresh his memory. It was therefore no more incumbent of the commonwealth to produce and offer them in evidence than it was upon the defendants.

The case was tried by the learned judge with great patience, care and impartiality, and all of the assignments must be overruled.

The judgment is affirmed and the record is remitted to the court of quarter sessions of Allegheny county with direction that the judgment be fully carried into effect, and to that end it is ordered that the defendant forthwith appear in that court and that he be by that court committed to serve and comply with such part of his sentence as had not been performed at the time this appeal was made a supersedeas.