Commonwealth *v.* Rogers et al., Appellants.

472

Argued June 9, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

Before Kreider, J.

*David S. Kohn*, with him *Warren G. Morgan*, for appellant.

*Frank McGuigan*, for appellant.

*Eugene Nogi*, with him *Russell J. O'Malley, Bernard Rothman*, and *Nogi, O'Malley & Harris*, and *Handler & Rosenberg*, for appellant.

*Huette F. Dowling*, District Attorney, with him *Charles J. Ware* and *Alfred P. Filippone*, Special Assistant Attorneys General, and *Thomas D. McBride*, Attorney General, for Commonwealth, appellee.

OPINION BY RHODES, P. J., September 16, 1958:

Thirteen defendants[1] were indicted in the Court of Quarter Sessions of Dauphin County for conspiracy to cheat and defraud the Pennsylvania Turnpike Commission, an instrumentality of the Commonwealth of Pennsylvania. Prior to trial four of the defendants[2]

---

[1] Donald Burkert; Mario Fronduti; John H. Munley; Roger A. Hines; John F. Williams; Evan Moses; William Lipferg; David R. Jones; Francis Chiazza; George Oswald; Walter G. Ketas; Robert Havard; Joseph Rogers.

[2] Mario Fronduti; John H. Munley; John F. Williams; George Oswald.

entered pleas of guilty; another defendant[3] was seriously ill and could not appear, and his case was continued. The remaining eight defendants[4] pleaded not guilty, and were convicted after trial before a jury. Each filed motions in arrest of judgment and for a new trial which were overruled by the court below, and sentence was imposed. Subsequently one of the defendants, Walter G. Ketas (also known as Walter J. Ketas) withdrew his motions and presented himself for sentence. Seven defendants have appealed to this Court.

Each appellant has questioned the jurisdiction of the Court of Quarter Sessions of Dauphin County to try the offense charged in the indictment. Two of the appellants, Donald Burkert and Evan Moses, also contend that the evidence was insufficient to sustain their convictions. No other question has been raised on appeal.

On February 28, 1955, the Pennsylvania Turnpike Commission entered into a contract with Manu-Mine Research and Development Company relating to certain phases of the construction of the Northeastern Extension of the Pennsylvania Turnpike. Subsequently, on August 10, 1955, the commission, at Harrisburg, entered into a contract with Joseph Rogers and Amos Rogers, trading as Rogers Construction Company, for the slushing of mine areas on the turnpike in the vicinity of Scranton, Lackawanna County. Another contract, dated August 29, 1955, executed at Harrisburg, provided for the slushing of mine areas by the Rogers Construction Company along the line of the North-

---

[3] David R. Jones.

[4] Joseph Rogers; Robert Havard; Roger A. Hines; Francis Chiazza; William Lipferg, also known as William Lipfert; Evan Moses; Donald Burkert; Walter G. Ketas, also known as Walter J. Ketas.

eastern Extension also in the vicinity of Scranton. Under these two contracts Rogers Construction Company was to furnish an estimated 716,742 tons of silt and 563,130 tons of sand at $1.71 and $1.81 per ton, respectively. These materials were obtained from nearby sources and hauled in trucks by the Rogers Construction Company to boreholes drilled by Manu-Mine. At the boreholes the truck loads of silt and sand were slushed through a pipe and used to fill the mined-out areas under the proposed turnpike extension. The work was to be performed under the supervision of Manu-Mine Research and Development Company. Manu-Mine maintained inspectors who checked the material at the loading points and at the boreholes where the material was deposited. Weight or delivery slips were issued by Manu-Mine inspectors at the loading point in the form of an original and four copies. Of the five slips one copy was retained by the Manu-Mine inspector at the delivery point, one copy was remitted to the office of Manu-Mine at Moosic, one copy was retained at the loading point; Rogers Construction Company received two copies, one of which was sent to Harrisburg.

George Oswald, one of the thirteen defendants originally indicted, was superintendent of Rogers Construction Company; he entered a plea of guilty before trial and testified for the Commonwealth. His testimony clearly established the formation and the existence of the conspiracy. This witness said that from the Lackawanna River to Taylor the mined-out areas were numerous and the holes bored accommodated substantial fill, but that beyond Main Street in the Borough of Taylor the holes drilled by Manu-Mine took much less material than had been estimated. He also testified that in October, 1955, Walter G. Ketas, general manager of Rogers Construction Company, in the

presence of Joseph Rogers, requested him (Oswald) to attempt an arrangement with the Manu-Mine inspectors so as to secure delivery slips for material not actually furnished. Oswald testified: "So, one day I was called up to the office, and Mr. Ketas said, 'George, your tonnage is slipping. What is the matter down there?' I said, 'Well, we just can't get the estimated quantities down the holes. The holes aren't taking it. They are not open on the bottom. All we can get in is what is filling up the hole.' He said, 'Can't you do anything down there with those inspectors?' "

Accordingly, Oswald contacted the inspectors of Manu-Mine and ascertained that they would furnish extra slips in return for payment of $50 a week to each. Oswald named the Manu-Mine employes who were paid by him as Fronduti, Williams, Chiazza, Hines, Munley, Jones, Lipferg, and Moses. Fronduti, Munley, and Williams testified for the Commonwealth. Chiazza, Havard, Hines, and Lipferg testified before the investigating grand jury. Their testimony was read into evidence against them, and limited by the trial judge to each of them alone.

Havard was employed by the Rogers Construction Company and performed the same service at night as Oswald did in the daytime. They collected the spurious slips from the inspectors at the loading point and delivered them to the inspectors at the delivery point. Apparently the truck drivers did not receive copies of such slips. Burkert was superintendent of the slushing operation for Manu-Mine.

Oswald stated that, from November 1, 1955, to February, 1956, when the work was suspended, he received the money in the form of $50 bills from Joseph Rogers and Ketas, and paid the inspectors on Friday night or Saturday morning. In the beginning truck

loads of material that could not be used to fill the mine areas were dumped at convenient places, while false slips were issued for trucks which were not in service. Later those involved developed a plan known as "Ring-Around-the-Rosey," whereby the truck drivers hauled the same load back and forth, and false slips were signed by the inspectors falsely representing that the material had been deposited at the boreholes. Credit was given for each such trip, and the undelivered load was repeatedly charged to the Turnpike Commission. Originally the inspectors furnished about ninety bogus slips every twenty-four hours, at an average of fifteen tons per load. Later as high as one hundred fifty fraudulent claims were furnished by the inspectors in a twenty-four hour period. Oswald further stated that 60 per cent of the materials charged to the Turnpike Commission was never delivered.

Rogers Construction Company prepared a monthly estimate for partial payment under their contracts with the Turnpike Commission. These estimates were based on copies of delivery slips received by Rogers Construction Company. The periodic estimate was then turned over to the Turnpike Commission at its field office in Dupont, Luzerne County, and was there subjected to a preliminary check by the district construction engineer of the Turnpike Commission on the basis of copies of the delivery slips sent to the Dupont field office of the Turnpike Commission. No final approval was made at the field or district office, and no bills were paid therefrom. But after approval by the district engineer, the periodic estimate was dispatched by automobile to the commission at its main office in Harrisburg. Following re-check by the engineers at Harrisburg, the periodic estimates or bills of Rogers Construction Company were processed by the officers of the Turnpike Commission. Checks in

payment were drawn on the Fidelity-Philadelphia Trust Company of Philadelphia and mailed to Rogers Construction Company at Scranton. The latter received and cashed two checks under their contracts, one dated December 14, 1955, in the amount of $86,-023.41, and the second dated January 9, 1956, in the amount of $160,603.51. A third check in the amount of $237,862.88, dated February 6, 1956, issued and signed by officers of the Turnpike Commission, was canceled prior to receipt by Rogers Construction Company.

In the court below and on this appeal, appellants Burkert and Moses have questioned the sufficiency of the evidence to establish their guilt. Both were employes of Manu-Mine. Burkert, an employe since July 18, 1955, was in charge of the slushing operation. Moses was supervisor of inspectors under Burkert. Burkert, sixty-five years of age, was experienced as a mining engineer. He had not been financially successful and needed work in July, 1957, when he was hired by Manu-Mine. According to his testimony he was then receiving unemployment benefits of $30 per week. Representing Manu-Mine he laid out the boreholes for Manu-Mine on the job of the Rogers Construction Company; he was in complete charge of the operation for Manu-Mine, including the inspectors, some of whom were hired by him. His obvious interest in Rogers Construction Company was inconsistent with his duty to Manu-Mine under its contract with the Pennsylvania Turnpike Commission. Fronduti, an inspector, testified: "Mr. Burkert told me that Rogers Brothers was having a hard time, and he asked me if I would lean over backwards for them." On one occasion Burkert also directed Fronduti to release six trucks which were carrying, according to Fronduti, inferior or unacceptable material. Fronduti did not stop any trucks thereafter.

Burkert was on the job almost daily and he was in close association with Rogers and Ketas who instigated the conspiracy to defraud. It is apparent that Rogers had to have Burkert's direct or indirect cooperation to carry on the fraudulent scheme. The inspectors and the two supervisors were each paid $50 a week to operate the plan, while Burkert at the height of the fraud received a gift costing $1,035, all coming from Rogers. This gift of an organ to Burkert was given by Rogers Construction Company in December, 1955, allegedly in appreciation of a labor-saving device for unloading silt.

In view of the failure of the boreholes to take the estimated tonnage, Rogers sought credit for increased tonnage by false delivery slips. After the inauguration of this system, the tonnage charged to the Turnpike Commission increased greatly. A record was kept of the tonnage or production at a portable trailer office where Burkert spent considerable time. There was also a record of every borehole laid out by Burkert. He as superintendent of the entire project for Manu-Mine had the records available showing the suddenly increased tonnage. Moreover, their promiscuous depositing of silt "on rock banks and every place else" must have been visible to everyone who looked; Burkert admitted knowing of some dumping of material in a colliery yard for which he said credit was not allowed.

The trial judge, Honorable HOMER L. KREIDER, in overruling the motions of defendants in arrest of judgment and for a new trial, has said as to Burkert's conviction:

"If anything were lacking to establish that Burkert, Rogers, Ketas and others were acting in concert with a unity of purpose, that question is set at rest by their subsequent attempt to conceal the gift of the organ.

This conduct, in our opinion, established by clear and convincing evidence that the defendants Burkert, Rogers, Ketas and others were connected with and actively involved in the conspiracy charged in the indictment. Burkert testified that on or about February 20, [1956] Mr. Landsidle, Vice President of Manu-Mine, Mr. Sharpensberger, General Manager and his immediate superior, Harry Luke, Project Engineer, sent for him to come to the Manu-Mine trailer office after the work on the job had been stopped on February 13, 1956; that Landsidle told him he had learned there was an investigation being made of the Rogers job and said to him: 'Where there is smoke there is possibly fire. Do you know of any of our inspectors who might be dishonest? . . .' Burkert replied that 'a man in my position would have every reason to be suspicious of anybody, . . . I have cleared the inspectors and if anything might be looked upon with suspicion by other people, it might be the gift of a Hammond Electric Chord Organ to me at Christmas time,' . . . and then Burkert told him the story of that gift. Burkert also said that he had permission from his superiors Harry Luke and Joseph Speicher, to accept the gift before it was received. . . . (Luke and Speicher were not called to testify.)

"Burkert further testified . . . that 'Landsidle said to me "There is a police investigation going on here. What may happen, nobody knows. But, it could break in the newspaper headlines blaring the name of Manu-Mine and down in the corner a little bit of an insignificant note recording the gift of an organ to you. Can you pay for that organ?" I said, yes, I can pay for that organ.' Burkert stated that he was satisfied to pay for it and that 'it didn't hurt' . . . to do so because he had $3548.86 in his checking account in bank. . . . Burkert then wrote his check payable to the Rogers

Construction Co. for $1035 and at first dated it January 16, 1954 or more than two years prior to the actual date it was written. Burkert said when this mistake was called to his attention, he changed the date to the year 1956 but then discovered that he had made a second mistake in dating it 'January 16th' instead of February 20, 1956, but that when he discovered this mistake it was agreed by Landsidle, Rogers, Ketas and himself that the incorrect date, January 16, 1956, should remain on the check as written, that Landsidle insisted Burkert obtain a receipt from the Rogers Construction Co. and that when Rogers gave his receipt to Burkert for $1035 . . . he likewise made a mistake and when it was called to his attention it was agreed that the mistake Rogers made should not be corrected to the true date. . . .

"Under all the evidence we believe the conviction of Burkert was fully justified." See *Com. v. Nasuti,* 385 Pa. 436, 445, 123 A. 2d 435.

As to Moses, we think the circumstances are sufficient also to warrant conviction. He accepted the same payment of $50 a week given to the inspectors of whom he was the immediate supervisor. Three payments were made to him by Oswald. Although Oswald testified that Moses did not know why he was given these weekly payments from Rogers Construction Company through Oswald, this is a mere conclusion and cannot override that which is obvious from the circumstances. He was paid with regularity the same as the inspectors and the same as Jones, the other supervisor. The method of payment to others was likewise devious. Moreover, Moses had direct supervision of filling the boreholes which Burkert had laid out to be drilled, and he was at the bins to see that the pattern laid out by Burkert was carried out. The unexplained acceptance of the payments from the Rogers Construction

Company through Oswald places Moses in the same category as the inspectors who received such payments. As a supervisor of Manu-Mine inspectors he was in the center of the slushing operations. He had direct supervision of the inspectors at the silt bank, but he was usually at the bins and the boreholes. The fraudulent scheme could not have operated successfully without his tacit acquiescence at least. He must have seen or must have been aware of the dumping of silt by the truck drivers at various convenient sites instead of at the boreholes.

That Burkert and Moses may not have been named or involved initially in the conspiracy is of no moment. A conspiracy formed by certain persons may be considered adopted by others who come into the transaction at a later stage of the performance. *Com. v. Donnelly,* 40 Pa. Superior Ct. 116, 126; *Com. v. Rothensies,* 64 Pa. Superior Ct. 395, 406; *Com. v. Anderson,* 64 Pa. Superior Ct. 427, 429. While it requires more than mere passive cognizance of a crime on the part of a defendant to sustain a charge of conspiracy to commit it, nevertheless, if a conspiracy has been entered into by other parties without defendant's knowledge or participation and he becomes a party to it while it still has life, he may be convicted. *Com. v. Wasson,* 42 Pa. Superior Ct. 38, 51.

The other contention which had been presented by all the appellants relates to the jurisdiction of the Court of Quarter Sessions of Dauphin County to try these cases. It is argued that there was no overt act in furtherance of the conspiracy committed in Dauphin County. They contend that the conspiracy was formed in Lackawanna County and that the overt acts took place either in Lackawanna County or Luzerne County. Notwithstanding that the conspiracy may have been formed in Lackawanna County, that the

fraudulent slips were issued in that county, and that the false periodic estimates were presented to the field office of the Turnpike Commission in Dupont, Luzerne County, and then delivered to the main office of the commission in Harrisburg, it was at the main office of the commission at Harrisburg that action was intended to be taken upon the fraudulent claims and checks thereupon to be issued to Rogers Construction Company.

It is well settled that prosecution for a criminal conspiracy may be brought in the county where the unlawful combination or confederacy was formed, or in any county where an overt act was committed by any of the conspirators in furtherance of that unlawful combination or confederacy. *Com. v. Mezick*, 147 Pa. Superior Ct. 410, 413, 24 A. 2d 762. The question of jurisdiction as raised in the present appeals is controlled by *Com. v. Prep*, 186 Pa. Superior Ct. 442, 142 A. 2d 460, involving the same jurisdictional issue in connection with the charge of conspiracy. As we there said (page 451 of 186 Pa. Superior Ct., page 465 of 142 A. 2d) : "It is a well established theory of the law that, where one puts in force an agency for the commission of crime, he, in legal contemplation, accompanies the same to the point where it becomes effectual; . . ." The delivery of the false invoices by courier from the field office in Luzerne County to the main office of the commission in Harrisburg was no different than where a defendant personally carried the fraudulent documents to Harrisburg or sent them by agent or in the regular course of the mail. The fact that the false invoices were preliminarily checked in the field office does not negative the occurrence of the overt act in Dauphin County. The fraudulent weight or delivery slips and the false periodic estimates were made in furtherance of the conspiracy in

Lackawanna County or Luzerne County. But such estimates for partial payment were made for the ultimate purpose of securing the final approval and payment of the false invoices by the commission at Harrisburg. It was only at that place that final approval could be given and the checks prepared and issued. Consequently, it was in Dauphin County that the fraudulent scheme was consummated when the Turnpike Commission received the false slips and invoices and acted upon them. See *State v. Pollard,* 215 La. 655, 41 So. 2d 465, 468.

The judgments of sentence are affirmed as to Joseph Rogers, Robert Havard, Roger A. Hines, Francis Chiazza, William Lipferg, Evans Moses, and Donald Burkert, and it is ordered that defendants appear in the court below at such time as they may there be called, and that they be by that court committed until they have complied with their sentences or any part thereof which had not been performed at the time the appeals were made a supersedeas.

GUNTHER, J., dissents.

---

DISSENTING OPINION BY WATKINS, J.:

I would sustain the objections of the appellants to the jurisdiction of Dauphin County to try the offense charged in the indictment.

The testimony in this case establishes that the acts alleged to have been committed in furtherance of the conspiracy, to wit, the alleged false slips and the illegal dumping, the payments to inspectors and any and all acts, connected with construction of the Northeast extension of the Pennsylvania Turnpike took place either in Lackawanna County or near the border of Lackawanna and Luzerne Counties. The slips issued

pursuant to the slushing carried out by Rogers Construction Company were made in Lackawanna County and that one of a number of slips, which were prepared at the same time, were sent to the representatives of Manu-Mine, the supervisor of the project, which maintained its office in Dupont, Luzerne County. The Turnpike Commission, likewise, maintained an office in Dupont, Luzerne County and any slips which came into the possession of Manu-Mine and the Turnpike Commission came into their possession in Luzerne County.

Estimates were prepared by the Rogers Construction Company in Lackawanna County and were submitted to the Turnpike Commission office at Dupont, Luzerne County. The estimates were approved by duly authorized agents of the Turnpike Commission in Luzerne County. All of the above had to be completed in Luzerne County and from that point the appellants had nothing further to do with the procedure of payment.

The majority rely on the authority of the opinion in *Com. v. Prep*, 186 Pa. Superior Ct. 442, 142 A. 2d 460 (1958). I believe this to be an unfortunate opinion and represents sheer judicial legislation, but at least in that case the false weight slips were submitted to the Department of Highways in Harrisburg for audit. However, I do not believe any overt act of conspiracy was committed by the defendant in the *Prep* case or by the appellants in this case, in Dauphin County. The extension of the *Prep* decision to this case most certainly establishes the doctrine that in any case involving an agency or instrumentality of the Commonwealth, where a conspiracy is charged, venue will lie in Dauphin County.

The locus of a crime is always in issue, for a court has no jurisdiction of the offense unless committed in

the county where tried. *Com. v. Tarsnane*, 170 Pa. Superior Ct. 265, 85 A. 2d 606 (1952). In *Com. v. Mezick*, 147 Pa. Superior Ct. 410, 413, 24 A. 2d 762, 764, we said: "But it is well settled that prosecution for criminal conspiracy may be brought in the county where the unlawful combination or confederation was formed, *or* in any county where an overt act was committed by any of the conspirators in furtherance of that unlawful combination or confederacy..... An *overt* act is distinguished from that which rests merely in *intention* or design; and as used in the law of conspiracy it means an act done in furtherance of the object of the conspiracy."

In order to sustain jurisdiction of this offense the majority of this Court has invented the fiction that because the appellants had knowledge that checks in payment would come from Harrisburg and said checks in fact were mailed from Harrisburg, even though payment was made in Lackawanna County, this knowledge constitutes an overt act by the conspirators in furtherance of the object of conspiracy. It certainly amounts to a contention that their act in presenting periodic estimates in Dupont was an overt act in Dauphin County. I believe nothing could be further from the intent of the act or its application as set forth in the case above cited. See also: *Com. v. Schmunk*, 22 Pa. Superior Ct. 348, affirmed 207 Pa. 554, 56 A. 1088 (1904).

The burden of work in the Dauphin County Court, because of Commonwealth cases, has been constantly a source of discussion by the legislature. Yet, the position taken by the Dauphin County court here, by the use of judicial legislation under the guise of reading legislative intent into the Act, reaches out to increase its jurisdiction in criminal cases where the locus of the crime is in other counties.

It might be added, too, that Dauphin County, being the site of the State Capitol and the place where thousands of state employes live and work, is particularly susceptible to political rumors and propaganda. So much so, that a defendant to a charge involving politics or the government, where the incidents of the accusation have been the subject of a barrage of publicity, is at a distinct disadvantage. It is even doubtful, in such an atmosphere of prior trial by newspaper, radio and television, if a fair trial is possible, and his conviction is a foregone conclusion.

The historic rivalry between town and gown in a university area where a natural prejudice exists against the students and the town people can be compared to a similar prejudice existing between the "taxpayers" or the "people" of a State Capitol area and "job-holders", or "politicians".

With this realistic problem in mind, certainly rather than stretch the meaning of the legislature to increase the jurisdiction of Dauphin County in criminal cases the Act should be strictly construed so that the defendant may have the right to a jury from the vicinage of the locus of the crime.

It is also important to note the realistic problem that may confront an innocent citizen accused of crime, and he is innocent until proven guilty, if the jurisdiction is extended by the fiction suggested in the majority opinion. The defendant is then placed at a great disadvantage. He must obtain bail and do all the other necessary things that confront one accused of crime in a place far away from his home; obtain counsel in Dauphin County which may be in addition to his own local counsel and add greatly to his expenses; bear the added cost of transportation, although this is not the problem it might have been years ago; and obtain accommodations for himself and his witnesses

whenever his and their presence are necessary. His prior good reputation in his own community has no value in the strange jurisdiction, so that, his character testimony, which the law says is substantive, loses its force because the character witnesses necessarily come from the home area. Most important of all, his guilt and ultimate freedom will be determined by a jury drawn from an alien vicinage.

The Commonwealth is not at such a disadvantage. The machinery of prosecution is operating all the time in the district attorneys' offices in the counties of the Commonwealth. It certainly should not matter to the Commonwealth where the case is tried and there is no good reason, even that of expediency, to try the case other than in the county of the situs of the crime. We should take judicial notice of the facts that some of the defendants were arrested and indicted for the same offense in Lackawanna County, entered pleas of nolo contendere and are still awaiting sentence in that County.

The reluctance of this Court to set aside a conviction, which on the basis of the record, is perhaps warranted, nonetheless, produces a result based on expediency; unsettles the existing law, and adds to the confusion among practising lawyers, as well as making difficult the determination of the law by the courts below. The doctrine of stare decisis is a time honored and worthy principle that should not be lightly cast aside. This is most certainly true, where as here, there is redress readily available against the mischief complained of by a procedure in the proper jurisdiction.