Commonwealth *v.* Petrosky et al., Appellants.

98

[REDACTED]

Argued June 13, 1960. Before RHODES, P. J., GUN-THER, WRIGHT, WOODSIDE, ERVIN, WATKINS, and MONT-GOMERY, JJ.

[REDACTED]

*James W. Evans*, for appellants.

*William W. Lipsitt*, with him *A. C. Scales*, and *Reynolds and Lipsitt*, and *Scales and Shaw*, for appellant.

*Alfred P. Filippone*, Deputy Attorney General, with him *Mary E. Hoerner*, Assistant District Attorney, *Martin H. Lock*, District Attorney, and *Anne X. Alpern*, Attorney General, for Commonwealth, appellee.

OPINION BY RHODES, P. J., December 14, 1960:

The defendants, Roland J. Sell, Charles E. Fait, and Frank J. Petrosky, were indicted in Dauphin

County for cheating by fraudulent pretenses[1] the Commonwealth of Pennsylvania, Department of Highways, of the sum of $4,757.29 in connection with the sale of cinders for use in Westmoreland County, and with conspiracy to defraud.[2] The Commonwealth contended that Petrosky obtained this sum of money in payment for 3034.21 tons of cinders which he did not deliver, and that Sell and Fait, who were assistant superintendents in Westmoreland County for the Department of Highways, aided and abetted him. The three defendants were convicted by a jury on both indictments. Each defendant filed a motion in arrest of judgment and for a new trial.

These motions raised the questions (1) whether the Dauphin County Court had jurisdiction to try these cases; (2) whether the evidence was sufficient to sustain the verdicts; and (3) whether, due to alleged trial errors, a new trial should be granted.

From the judgments of sentence, defendants have appealed.

A contract, or purchase order, dated January 17, 1956, was awarded by the Commonwealth to David E. Ankney. The contract called for the delivery by Ankney to the Commonwealth for the Department of Highways of 5,000 tons of cinders at $1.46 per ton and 3,000 tons of cinders at $1.52 per ton, or a total price of $11,869. Ankney never received any request for delivery of cinders under this contract. Approximately one year after the award of the contract, Petrosky approached Ankney and offered to fill the contract and take it over. Ankney agreed to turn the purchase order over to Petrosky, and in return Petrosky agreed

---

[1] Section 836 of The Penal Code of June 24, 1939, P. L. 872, as amended, 18 PS §4836.

[2] Section 302 of The Penal Code of June 24, 1939, P. L. 872, as amended, 18 PS §4302.

to pay Ankney $800 from the contract payments. Ankney turned the purchase order over to Petrosky although no formal assignment of the contract was made. Petrosky requested billheads from Ankney because the cinders had to be billed in Ankney's name. Petrosky then filled out the billheads and submitted them. Ankney received a check of the Commonwealth issued by the State Treasurer in the amount of $12,394.58. Ankney cashed the check and drew a check payable to Petrosky in the amount of $11,594.58, which was the balance after $800 was deducted.

Defendants Sell and Fait were each in charge of a certain designated area. When cinders were delivered to a stockpile in a given locality, a state employe would sign the delivery slips or tickets which accompanied a truck driver for each load, one copy being retained by the driver, the other retained for state records. These accumulated delivery slips were used by caretakers and assistant superintendents as a basis for compiling and executing a material delivery record known as Form 2140. Sell and Fait, as assistant superintendents, signed these forms, together with their respective caretakers, and forwarded them with the supporting delivery tickets to the Department of Highways at Greensburg, Westmoreland County. The Greensburg office checked and compared these forms with the purchasing order and then prepared state invoices known as Form 222, which were sent to Harrisburg for audit and payment. Payment was made as previously indicated. The fraud was discovered and these prosecutions were instituted in Dauphin County.

Jurisdiction and venue were in Dauphin County.[3]

The crime of cheating by fraudulent pretenses is not completed until property is obtained by the de-

---

[3] For a discussion of the distinction between jurisdiction and venue, see *McGinley v. Scott*, 401 Pa. 310, 164 A. 2d 424.

fendant, but it is not essential for purposes of juris-
diction that the prosecution be brought only in the
county in which the defendant in person actually ob-
tains possession of the object. Jurisdiction has been
held to rest where the circumstances show that, for
all practical purposes, the object has been placed with-
in the control of the defendant. *Com. v. Prep,* 186 Pa.
Superior Ct. 442, 447, 448, 142 A. 2d 460.

Defendants argue that the Court of Quarter Ses-
sions of Dauphin County has no jurisdiction of the
crime of cheating by fraudulent pretenses or of the
conspiracy indictments because the check of the State
Treasurer was made payable to Ankney and mailed
to him at Ligonier, Westmoreland County, where it
was deposited by Ankney, and a new check written to
the order of Petrosky. They further argue that the
transaction was not complete until Petrosky received
the check from Ankney. For these reasons, defendants
seek to distinguish this case from the *Prep* case.[4]

We fail to see a substantial distinction on the ques-
tion of jurisdiction (venue) between the *Prep* case and
the one at bar. We agree with Judge KREIDER of the
court below when he said in his opinion: "By persuad-
ing Ankney to 'assign' the contract, by the utilization
of Ankney's billheads and by making the agreement
whereby Ankney would pass on to Petrosky the Com-
monwealth's remittance, less the sum of $800.00, Pe-
trosky in effect constituted Ankney as his agent in
the fraudulent scheme. It is true that in this case
the postmaster at Harrisburg upon receipt of the Com-
monwealth's check addressed to Ankney, became the

[4] In the *Prep* case, the check was made payable to Prep and
was mailed directly to him in Schuylkill County. We held that the
crime was completed upon the mailing of the check in Dauphin
County by the State Treasurer, and that the postmaster was act-
ing as the agent for the accused.

latter's agent. However, because of the prior manipulated agency status that Petrosky had thrust on Ankney, the Harrisburg postmaster in mailing the State Treasurer's check also became the agent of the defendant Petrosky and the codefendants Sell and Fait. The chain of control was longer and perhaps more devious in the instant case than it was in the *Prep* case, but when traced from the beginning to the end it discloses an unbroken trail from the Treasury of the Commonwealth to the defendant Petrosky. The crime was complete and the object of the false pretense was 'obtained'[5] in Dauphin County when the check of the State Treasurer was placed in the hands of the innocent postmaster at Harrisburg. The accomplishment of this act, together with that of sending to Harrisburg the false material delivery records signed by Sell and Fait, constituted overt acts in Dauphin County by the defendants in furtherance of the conspiracy."

It is also well settled that prosecution for a criminal conspiracy may be brought in the county where the unlawful combination or confederacy was formed, or in any county where an overt act was committed by any of the conspirators in furtherance of that unlawful combination or confederacy. *Com. v. Prep,* supra, 186 Pa. Superior Ct. 442, 450, 142 A. 2d 460; *Com. v. Mezick,* 147 Pa. Superior Ct. 410, 413, 24 A. 2d 762. We said in the *Prep* case (page 451 of 186 Pa. Superior Ct., page 465 of 142 A. 2d) : "It is a well established theory of the law that, where one puts in force an agency for the commission of crime, he, in legal contemplation, accompanies the same to the point where it becomes effectual; . . ." See, also, *Com. v. Rogers,* 187 Pa. Superior Ct. 471, 483, 144 A. 2d 662.

In the instant case, Petrosky with the aid of Sell and Fait put in force an agency for the commission

---

[5] See *Com. v. Schmunk,* 22 Pa. Superior Ct. 348, 355.

of the crime, and they, in legal contemplation, accompanied the same to the point where it became effective, that is, in Dauphin County where the check was mailed to the agent Ankney by whom the fruits of the conspiracy were delivered to Petrosky.

Defendants' objection to jurisdiction (venue) were properly dismissed.

In support of their motions in arrest of judgment and for a new trial, the defendants argue that the evidence was insufficient to sustain their conviction of either of the crimes charged.

The crime of obtaining any chattel, money, or valuable security by fraudulent pretenses, under section 836 of The Penal Code of June 24, 1939, P. L. 872, as amended, 18 PS §4836, is completed when there coexist the following elements: (1) A false pretense; (2) an obtaining of property of value thereby; and (3) an intent to cheat and defraud. *Com. v. Prep,* supra, 186 Pa. Superior Ct. 442, 446, 142 A. 2d 460.

The elements of the crime of conspiracy are (1) a combination of two or more persons, (2) with criminal intent or corrupt motive, (3) to do a criminal or unlawful act or an act not in itself unlawful by criminal or unlawful means. *Com. v. Kirk,* 141 Pa. Superior Ct. 123, 137, 14 A. 2d 914.

The evidence viewed in a light most favorable to the verdicts (*Com. v. Mitchell,* 181 Pa. Superior Ct. 225, 227, 124 A. 2d 407) is as follows:

Earl J. Mellman, the expert witness for the Commonwealth, stated that, as a result of his audit, Petrosky, through Ankney, was paid for 3034.21 tons of cinders which were not delivered, resulting in a total overpayment of $4,512.23. The Commonwealth proved that the shortage of this amount of cinders arose out of fraudulent claims covering alleged deliveries of cinders by Petrosky as set forth in two material de-

livery records, Form 2140. The first purports to show that 2923.90 tons of cinders were delivered on December 4, 5, and 6, 1956, at a place known as "Five Points," Salem Township, Westmoreland County, when in fact only 600 tons were delivered, thus creating a shortage of 2323.90 tons, which represented an overcharge of $3,432.56. This material delivery record was signed by defendant Sell, as assistant superintendent, and by Richard V. Brahosky, a caretaker, at the "Five Points" location. The second material delivery record was signed by the defendant Fait, as assistant superintendent, and by Charles E. Weaver, a caretaker, at or near Irwin in Penn Township and North Huntingdon Township. Petrosky submitted a claim for 1274.85 tons of cinders, when in fact the evidence tended to show that only 564.54 tons were actually delivered, thereby creating a shortage of 710.31 tons, resulting in an overpayment of $1,079.67. The overcharges total $4,512.23.[6]

The evidence indicates that, when Petrosky's truck driver appeared with a load of cinders at the State stockpile, he would hand to the employe receiving the cinders a pad or book containing original white delivery slips and carbon copies designated "Weighmaster's Certificate." These slips were issued by the Salem Supply Company which was owned by Petrosky. The receiver of the cinders would sign and detach the original white delivery slips from the truck driver's pad and deliver them to his superior, known as a "caretaker," who would use them in preparing his material delivery record, Form 2140, and who would in turn deliver them to the assistant superintendent. The assistant superintendent would turn them over to the

---

[6] The difference between the $4,757.29 claim in the indictment and the $4,512.23 represented certain miscellaneous items for an alleged overcharge in hauling which were not submitted to the jury by the trial judge for lack of sufficient evidence.

invoice clerk and chief clerk for checking. The duplicate delivery slips would be returned by the truck driver to his employer, Petrosky. Petrosky then billed the Department of Highways for the cinders he allegedly hauled.

The original delivery slips used by Petrosky gave considerable detailed information including the net weight, weighmaster's license number and signature, the name of the truck driver, and the vehicle license number. The Commonwealth established that 298 original delivery slips were removed from the Greensburg office of the Department of Highways by Petrosky, and others were substituted. Petrosky's explanation was that in April, 1957, he received a call from a woman in the office at Greensburg advising him that the weighmaster's license number was missing from the slips, and that he should have them "re-made." The new slips were compiled on a form used by grocery stores. These grocery type slips were prepared by James G. Lattimer, Petrosky's employe, and signed by him as "weighmaster," although he did not originally weigh the cinders. No vehicle number, driver's name, or signature of any receiver appeared on the new slips. Petrosky then testified that he returned the originals and the re-made slips to the highway shed. However, the investigating officer, Roy O. Wellendorf, testified that Petrosky admitted giving these substituted delivery slips to Sell and Fait "to be applied" in their respective sections of the Department of Highways.[7] The originals were never found. Petrosky testified that he did not keep his own duplicate delivery receipts.

The jury could properly find from the evidence that Petrosky fraudulently removed the original delivery slips and substituted others to conceal fraudulent

---

[7] As to Sell and Fait the testimony was limited by the trial judge to the charge of conspiracy.

claims he had made for cinders never delivered. The "re-made" slips were wholly unnecessary if in fact the original white delivery slips were genuine, as, in that event, it was only necessary that the weighmaster write his name and license number on those slips at the office of the Department of Highways at Greensburg.

With respect to Fait, the Commonwealth's evidence showed, and Fait admitted, that he prepared the material delivery record which showed a shortage of 710.81 tons, signing it as the person actually receiving the material. Although he never in fact received any cinders on December 4th and 5th because he was absent on a deer hunting trip, he took the tickets to the highway shed in Greensburg and made up Form 2140 at the request of his caretaker, Weaver, who had received the cinders in Fait's absence. Fait testified that he kept no record of the 2140 forms which he signed, and that, although it was not his job to check the material delivery slips as against the 2140 forms, he would have to check the material delivery slips "to some extent." He further testified that Petrosky never turned any material delivery slips over to him, and that the slips he received from Weaver were their regular slips. He testified that he rarely made out 2140 forms; that they were usually prepared by the caretaker.

Fait's caretaker, Weaver, testified that he kept a record of deliveries between December 3 and 7, 1956, in a "little book." This book was produced at the trial and disclosed the license numbers of the trucks making delivery, the number of loads, and, in some instances, the names of the truck drivers. This was one of the records which the Commonwealth's expert witness, Mellman, used to determine the shortage which existed.

Sell admitted signing the material delivery record with his caretaker, Brahosky, covering deliveries on December 4th, 5th, and 6th, on which the Common-

wealth showed a shortage of 2323.90 tons of cinders. Brahosky testified that he was deer hunting on December 4th and 5th; that he signed the material delivery record upon his return on December 6, 1956; and that a laborer named Howard S. Elliott actually receipted for the cinders and turned the material delivery slips over to Brahosky who gave them to Sell. Elliott was indefinite as to the number of loads received at Five Points on the dates in question, although he recalled that the Battistella Trucking Company delivered fifty loads.

Sell testified that, when he received the delivery slips and Form 2140 from Brahosky, the form was not fully made out. He took it to the highway shed and had the clerk total the slips on an adding machine and then returned it to Brahosky for his signature. Sell claimed that he did not check the delivery slips against the totals. He stated that the white original and the carbons of Form 2140 material delivery record should have been completely filled out initially. However, the exhibits indicated that the pink copy was not complete and contained no tonnage. Further, the entries on the yellow copy, showing the date and authorization number, were in carbon, while the route, operation number, and the number of pounds of cinders allegedly delivered were in pencil. Sell was not able to explain these discrepancies.

The evidence involved was largely documentary and circumstantial. That the evidence was wholly or largely circumstantial is not fatal if it appears that the evidence is such as reasonably and naturally justifies an inference of guilt of the accused and is of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the guilt of the accused beyond a reasonable doubt. The nature of the crime of conspiracy makes it such that it is rarely susceptible of other proof than by circumstantial evi-

dence. Therefore, in a conspiracy trial, when fraud is involved, there is a wide latitude allowed in the introduction of evidence. *Com. v. Evans,* 190 Pa. Superior Ct. 179, 201, 202, 154 A. 2d 57, affirmed 399 Pa. 387, 160 A. 2d 407.

We are of the opinion that the evidence taken as a whole shows that the defendants Sell, Fait, and Petrosky were parties to a conspiracy to cheat and defraud the Commonwealth; that they succeeded in their unlawful plan; and that Petrosky obtained the fruits of the conspiracy, and Sell and Fait aided and abetted him in achieving that unlawful goal.

Defendants raised numerous alleged trial errors. They allege first that a fair trial was denied because they were not permitted to select the indictments which the Commonwealth should call for trial. The defendants requested that all fourteen indictments concerning Westmoreland County and involving numerous defendants be tried at the same time. The trial judge was of the opinion that to do so would be chaotic and confusing to the jury. There is no merit to the defendants' argument. The consolidation of two or more indictments for trial is in the discretion of the trial court. *Com. v. Evans,* supra, 190 Pa. Superior Ct. 179, 230, 154 A. 2d 57. The court below did not abuse its discretion by refusing the defendants' request.

The trial judge did not err in his refusal of defendants' point for charge to the effect that, if the jury found that the 298 grocery type delivery slips were not prepared until after December 21, 1956, the date of the conspiracy and fraudulent pretenses alleged in the indictments, they could not find defendants guilty of fraudulent pretense. This request is based on an erroneous conception of the Commonwealth case. The Commonwealth showed that false Forms 2140 were prepared by Sell and Fait prior to December 21, 1956. The date of the preparation of the substituted delivery slips

was not determinative on the issue of fraudulent pretenses. Substitution of the slips, either before or after December 21, 1956, was a circumstance tending to establish the fraudulent scheme charged in the indictment.

The trial judge properly refused a supplemental point for charge submitted by the defendants which, in effect, requested the court to charge the jury with respect to an alleged factual matter which was not in evidence but which the defendants desired the Commonwealth to stipulate. The Commonwealth refused, and the matter ended with no stipulation being agreed upon. There being no evidence to warrant the point for charge, the trial judge properly declined to so charge the jury.

Two prospective jurors, on their voir dire examination, inadvertently stated they had formed an opinion and would convict defendants. Both were properly challenged for cause and dismissed, and the trial judge immediately directed the jurors already sworn to disregard the remarks. A motion to withdraw a juror is addressed to the sound discretion of the trial judge, and his action will only be reversed for abuse of discretion. *Com. v. Schumann,* 162 Pa. Superior Ct. 330, 333, 57 A. 2d 425. There was no error in the refusal of the trial judge to withdraw a juror on this ground.

Defendants argue that the trial judge erred in allowing to be introduced in evidence the "bid proposal" attached to the purchase order, the contract awarded in the first instance to Ankney. This bid proposal was an integral part of the purchase order, and an offer of proof to establish its relevancy was not required. Moreover, the fact that the bid proposal as well as the purchase order called for deliveries in Ligonier Township, while the evidence showed deliveries to Salem Township and North Huntingdon Township, is of no consequence because the court had instructed the jury

that the Commonwealth's theory was a non-delivery of cinders, and nothing else.

The trial judge did not err in allowing Ankney to testify concerning his ability to deliver cinders under the purchase order and as to what he considered in making up his bid. The Commonwealth was entitled to show the manner in which Ankney obtained his purchase order and the background of the relationship between Ankney and Petrosky. As we have indicated, in a conspiracy trial, where fraud is involved, there is a wide latitude allowed in the introduction of evidence. *Com. v. Evans,* supra, 190 Pa. Superior Ct. 179, 202, 154 A. 2d 57. This testimony had no adverse effect on either Sell or Fait because, at its introduction, the trial judge told the jury that neither Sell nor Fait had anything to do with the actual ordering of cinders.

Nor did the trial judge err in admitting into evidence the 298 substituted grocery type material delivery slips. Although they were not the original delivery slips they were clearly admissible. The witness Lattimer stated that these substitute slips could have been prepared by him as early as December, 1956. The jury would thus have been justified in finding that they were an integral part of the false pretenses, since they predated the invoice and payment by the Commonwealth. The exhibits in question were also admissible in that they tended to show an effort on the part of Petrosky to conceal, by destruction, the original delivery slips.

Defendants argue that the trial judge erred in sustaining the Commonwealth's objections to questions asked by the defense on cross-examination. In each of these situations, the defense attempted to exceed the scope of direct examination and introduce new issues and matters of defense. The scope of cross-examination is largely within the sound discretion of the trial judge. *Com. v. Cano,* 182 Pa. Superior Ct. 524, 549,

128 A. 2d 358. The orderly nature of trial proceedings calls for the introduction of one side at a time. The trial judge did not err in requiring the defense to withhold its evidence until the conclusion of the Commonwealth's case.

The trial judge properly refused defendants' motion to strike the expert testimony of the Commonwealth witness Mellman who testified concerning the shortage which his audit revealed. The witness properly established himself as an expert. He then testified concerning the documents he examined, and gave his opinion that a shortage of cinder deliveries existed and that an overpayment resulted. Where, as here, the original records are in court and available for examination by defendants, and where the witness testifying to the summary made therefrom is available for detailed cross-examination, it rests within the sound discretion of the trial judge as to the admissibility of a compact summary as a substitute for the voluminous original records. *Keller v. Porta,* 172 Pa. Superior Ct. 651, 657, 94 A. 2d 140.

Defendants argue that the trial judge erred in sustaining objections by the Commonwealth to the cross-examination of the investigating officer Wellendorf as to whether he had shown certain material delivery records to Raymond A. Davis, a caretaker, and whether the latter had told Wellendorf that he had not previously seen delivery slips allegedly supporting six 2140 forms. These particular records were not the subject of criticism by the Commonwealth and were irrelevant to the issues. No claim was made that the six forms in question were false. The ruling was correct.

Defendants also complain of the alleged error of the trial judge in refusing their requested instruction that a party calling a witness holds that witness out as a truthful person and is bound by his testimony.

This request was not timely presented to the court. However, the court, in its general charge, instructed the jury that they alone can decide the facts, the weight, and the value of the testimony of the witnesses, whether contradictory or not, and that the jury may believe all or part or none of the evidence given by a witness.

Defendants urge error in failing to instruct the jury that a statement made by one defendant, not in the presence of another, is admissible as to the other defendant only on the charge of conspiracy and not on the charge of fraudulent pretense. While the trial judge did not comment specifically in the general charge on this point, and was not requested to do so by defense counsel at the conclusion thereof, the record shows that the trial judge specifically and clearly instructed the jury during the trial in conformity with the law as stated by defense counsel in his motion. During the trial, defense counsel agreed that this instruction to the jury was sufficiently clear, and that it need not have been repeated. The statements made by the trial judge during the course of the trial were clear and adequate, and failure to repeat them in his charge was not error. *Com. v. Berman,* 119 Pa. Superior Ct. 315, 330, 181 A. 244.

The final reason assigned for a new trial was that the charge of the court overemphasized the evidence and contentions of the Commonwealth. There is no merit in this. The charge was full and complete, and it fairly presented the issues to the jury.

The evidence was sufficient to establish the guilt of defendants beyond a reasonable doubt, and a careful review of the record discloses no reversible error.

The judgments of sentence are affirmed, and it is ordered that defendants appear in the court below at such time as they may there be called, and that they be by that court committed until they have complied with

their sentences or any part thereof which had not been performed at the time the appeals were made a supersedeas.

---

DISSENTING OPINION BY GUNTHER, J.:

I dissent from the majority opinion sustaining the judgments of sentence in these appeals. My view compels reversal.

These appeals involve two basic questions which control the disposition of all other questions raised: (1) The jurisdiction of the Court of Quarter Sessions of Dauphin County to indict and try appellants for the crimes of cheating by fraudulent pretenses and conspiracy to cheat and defraud the Department of Highways of the Commonwealth of Pennsylvania, and (2) the sufficiency of the evidence to sustain the verdicts on these charges. Appellants were convicted of conspiring to submit and having submitted two false invoices for 8376.15 tons of cinders for use in Westmoreland County when only 5341.9 tons allegedly were delivered, or a shortage of 3034.25 tons valued at $4,757.29.

On January 17, 1956, a contract was awarded by the Commonwealth of Pennsylvania to David E. Ankney for the delivery to certain points in Westmoreland County of 5,000 tons of cinders at $1.46 per ton and 3,000 tons at $1.52 per ton, for a total price of $11,869.00. Ankney testified that he never received any requests from the superintendent of the State Highway Department for Westmoreland County or from any other person for the delivery of cinders under the contract. About a year after the contract was awarded, appellant Petrosky approached Ankney and stated he would like to fill the order and take it over. Ankney agreed to turn the purchase order over to him, and in return, Petrosky agreed to pay Ankney the sum of

eight hundred dollars from the contract payments made. There was no formal assignment of the purchase order. Petrosky merely delivered cinders for Ankney under the order awarded to him. The invoices were prepared by Petrosky on Ankney's billheads and sent by him to the State Highway Department office at Greensburg, Westmoreland County to be processed and ultimately forwarded by that office to the main office at Harrisburg for approval and payment. Subsequently, the State Treasurer sent a check for $12,-394.58 to Ankney at Ligonier, Pennsylvania. Ankney cashed the check and, in turn, gave his personal check to Petrosky in the amount of $11,594.58.

Appellants, Sell and Fait, were assistant superintendents in Westmoreland County for the Department of Highways. Each was in charge of certain designated townships but neither of them had authority to order or ordered or requested deliveries of cinders. This authority was vested in Patrick J. McShane, the superintendent for the area. Each assistant superintendent had several caretakers under his jurisdiction and each caretaker, in turn, had a number of laborers working under his control and supervision. When cinders were delivered to a stock pile in any of the localities, any state employe on hand at the time signed the delivery slips or tickets which accompanied a truck driver for each load, one copy being retained by the driver and the other copy being retained for state records.

The delivery tickets were retained in the field (stock pile location) until a series of deliveries, usually covering several days, had been made, at which time these tickets were turned over to the caretaker in charge of the stock pile. He then compiled them on a state form No. 2140, called material delivery records. Appellants, Sell and Fait, signed these forms with their respective caretakers and then forwarded them

together with the supporting delivery tickets, to the main office in Greensburg, Westmoreland County, for comparison with the purchase order and for checking for accuracy. From these records, state invoices, known as form No. 222, were prepared and sent by that office to Harrisburg for audit and payment.

Appellants' first contention is that Dauphin County lacked jurisdiction or venue over the offenses here charged. The Commonwealth, on the other hand, urges that this contention has been effectively disposed of under our ruling in *Commonwealth v. Prep,* 186 Pa. Superior Ct. 442, 142 A. 2d 460. We there held that a prosecution for the crime of cheating by fraudulent pretenses should be brought in the county where the offense is completed, that is, where the chattel, money or valuable security is obtained. We further held that such a crime was completed when checks were mailed in Dauphin County by the State Treasurer and that the postmaster was acting as an agent for the accused. When the checks were posted in Dauphin County they were, in effect, delivered to the accused in Dauphin County and this act, by reasons of the selection of the postmaster as agent for the recipient, was sufficient to confer jurisdiction upon the Court of Quarter Sessions of Dauphin County.

In view of our holding in the *Prep* case, supra, there is no doubt that if the facts of the instant case were identical or sufficiently similar to that case, the question of jurisdiction or venue would no longer be an issue. I do not believe, however, that the facts of the instant case can be applied to that case. The contract for supplying cinders to the Commonwealth was made with Ankney, and it was he who furnished the required bond to the Commonwealth for faithful performance; the State Treasurer drew the check, dated February 8, 1957, to D. E. Ankney as payee and mailed it to him at Ligonier, Pennsylvania, where it was re-

ceived, deposited for collection and cashed by Ankney. Any transaction completed in Dauphin County, therefore, was completed with Ankney who is not a defendant in these proceedings. The Commonwealth's evidence disclosed that Ankney drew a check, dated February 13, 1957, payable to Petrosky, drawn on the Mellon National Bank and Trust Company, Ligonier, Pennsylvania. In the normal course of events, the check made payable to Ankney cleared the depositary bank of the Commonwealth before he drew his check made payable to Petrosky. Under the agency theory, the postmaster in Harrisburg was the agent for Ankney and not for Petrosky. There is no evidence that Petrosky received any Commonwealth funds whatever, and any funds received by him were received from Ankney and drawn on a bank in Westmoreland County, cashed in Westmoreland County.

It is urged, however, that because of the alleged agency manipulation of Petrosky, the postmaster in Harrisburg, in mailing the State Treasurer's check, also became the agent of Petrosky and the co-defendants, Sell and Fait. The difficulty with this argument is that there is no evidence of any agency relationship between Ankney and Petrosky nor can one be inferred from their actions. The evidence, on the contrary, shows that Ankney assigned the performance of the contract to Petrosky (and this is alleged in the indictment) and that Petrosky agreed to pay him eight hundred dollars for filling the order. Ankney did not agree to supervise the filling of the order or to take any steps, either directly or indirectly, in filling the same. While it is true, so far as the Commonwealth was concerned, that the responsibility of faithful performance remained with Ankney so far as his bond was concerned, the transaction between Ankney and Petrosky was not that of agency but that of an independent undertaking. This is so, notwithstanding the

fact that the Commonwealth was not notified of the assignment. The postmaster in Harrisburg, therefore, could have acted as the agent of a disclosed principal but not as an agent for an undisclosed agent or agents. Moreover, defendants Sell and Fait were not present when the agreement was concluded between Ankney and Petrosky; they were not parties to it either directly or indirectly, and it is difficult to understand under what theory the postmaster could have acted as an agent for Sell and Fait.

The crime of obtaining any chattel, money, or valuable security by fraudulent pretenses under section 836 of The Penal Code of 1939, June 24, P. L. 872, as amended, 18 P.S. section 4836, is completed when, and only when, there *coexists* the following elements: (1) A false pretense; (2) obtaining of property of value thereby; and (3) an intent to cheat and defraud. *Commonwealth v. Prep,* supra; *Commonwealth v. Hancock,* 177 Pa. Superior Ct. 585, 112 A. 2d 407. The crime of cheating by fraudulent pretense is not complete until property is obtained by the defendant or defendants. As stated in *Commonwealth v. Schmunk,* 22 Pa. Superior Ct. 348, 354, affirmed by the Supreme Court at 207 Pa. 544, 56 A. 1088: " '. . . to obtain from another person any chattel, money or valuable security with intent to cheat or defraud any person of the same,' within the meaning of our criminal statute means and refers to the final step in the succession of rights and events by which the defendant gets, secures and obtains the chattel, money or valuable security, so as to complete the offense, and consummates his purpose." See also *Commonwealth v. Randle,* 119 Pa. Superior Ct. 217, 180 A. 720. There is no proof here that any of the defendants obtained money or anything of value from the Commonwealth or that any one aided or assisted in securing the payment of such money from the Commonwealth. It does not follow that Dauphin

County has jurisdiction in all cases simply because the money or thing of value may be traced directly or indirectly as coming from Harrisburg without regard as to where, under what circumstances and by whom such are received.

The crime of conspiracy, insofar as jurisdiction or venue is concerned, is open to the same objections. In *Commonwealth v. Mezick*, 147 Pa. Superior Ct. 410, 24 A. 2d 762, we said: "But it is well settled that prosecution for criminal conspiracy may be brought in the county where the unlawful combination or confederation was formed, or in any county where an overt act was committed by any of the conspirators in furtherance of that unlawful combination or confederacy." All appellants contend that Dauphin County had no jurisdiction to try them on this charge since any alleged conspiracy was formed and completed in Westmoreland County. The evidence discloses no overt act in Dauphin County committed in furtherance of the object of the alleged conspiracy. Admitting that Petrosky submitted allegedly false or fraudulent invoices in Westmoreland County with the alleged intention that they be acted upon and forwarded to Harrisburg for payment, there is nothing to show that such intention was effectuated by payment to him in Dauphin County. Moreover, insofar as defendants Sell and Fait are concerned, whatever overt act they are alleged to have performed or committed terminated in Westmoreland County. While they might have been responsible for any subsequent act in furtherance of the objects of the alleged conspiracy, nothing has been shown here to give Dauphin County jurisdiction over this offense.

I conclude, therefore, that Dauphin County did not have jurisdiction over the offenses here charged and that such prosecutions should have commenced in Westmoreland County.

I now turn to the second question involved, whether under the Act of 1951, June 15, P. L. 585, 19 P.S. section 871, the motions in arrest of judgment, because of insufficiency of evidence to sustain the verdicts, should have been granted. As stated in *Commonwealth v. McSorley*, 189 Pa. Superior Ct. 223, 150 A. 2d 570, the Act imposes upon the court the duty to consider the entire record to determine whether there is sufficient evidence to establish the guilt of the defendants. We must reject all of the defendants' evidence which the jury had a right to disbelieve and accept as true all of the Commonwealth's evidence upon which the jury could have properly based its verdicts.

The Commonwealth contends that Petrosky delivered 3034.21 tons of cinders less than what should have been delivered and that he submitted two material delivery records or caused the same to be submitted in which such shortages are disclosed. The first record purported to show that 2923.90 tons of cinders were delivered on December 4, 5 and 6, 1956, at Five Points, Salem Township, Westmoreland County when, in fact, only 600 tons were actually delivered, thus creating a shortage of 2323.90 tons. The second record purported to show that 1274.85 tons were delivered in Penn and North Huntingdon Townships when only 564.54 tons were actually delivered, creating a shortage of 710.31 tons. The delivery slips at Five Points were signed by R. J. Sell and Richard V. Brahosky, the caretaker, whereas those at Penn and North Huntingdon Townships were signed by Charles E. Fait and Charles E. Weaver, the caretaker.

The evidence disclosed that when a truck driver of the defendant Petrosky appeared at the respective dumping sites with a load of cinders, he handed to the receiver of the load a pad or book containing original white delivery slips and carbon copies of the same. These slips were issued by Salem Supply Company

which was owned by Petrosky. The representatives of the Commonwealth signed all slips and retained the original while the duplicates were returned by the driver to Petrosky as evidence of delivery.

The Commonwealth called three witnesses who were on the scene when the deliveries of the cinders were made. Richard V. Brahosky testified that during the deliveries made on December 4 and 5, 1956, he was on a hunting trip and that Howard S. Elliot, a laborer, receipted for shipments during those two days. He stated that at this delivery point "we got an awful lot of cinders at that time. Whenever we were stocking them, we had an extra high pile there because they were right up high." He further stated that this stock pile would hold approximately 3000 tons of cinders but that he couldn't be exact as he was not an engineer. Upon his return on December 6, 1956, he testified that additional deliveries were made and that he was present for these deliveries. He signed the 2140 form and stated that he would not have signed this form if, in fact, he did not receive all the cinders shown on the form. Howard Elliot testified that cinders were delivered on December 4 and 5, 1956, and that more than 50 loads may have been received in that period. He testified that more than one trucker delivered cinders to the site but the only one he could remember was Battistella. Mrs. Elizabeth Battistella testified that her records showed delivery of 600 tons of cinders by her trucks on December 4 and 5, 1956 and that nothing was delivered by her trucks on December 6th.

In connection with this testimony, the Commonwealth attempted to prove that only 600 tons of cinders were actually delivered—that delivered by the trucks of Battistella Trucking Company. However, from the testimony of these witnesses for the Commonwealth, it became obvious that more than 600 tons of cinders were actually delivered. Elliot testified that more than one

trucker delivered cinders during the two day period he was in charge and Brahosky testified to additional deliveries by other truckers on December 6, 1956.

E. J. Mellman, auditor for the Justice Department, testified that in arriving at the shortage claimed by the Commonwealth, he examined only the delivery records of Battistella Trucking Company and had no other records of deliveries by other truckers submitted to him.

Regarding the alleged shortage of deliveries to Penn and North Huntingdon Townships, Charles Weaver, caretaker, testified that during the period from December 3 to December 7, 1956, he was the caretaker at the two stations involved; that he kept some of the records—but not all—in a little book; that on December 3rd, his records showed a delivery of 12 loads at one station, 36 loads on December 4th, but kept no accurate records of deliveries for the vendor's (Petrosky's) trucks but that whatever were made were turned over to the Commonwealth; that accurate delivery records were kept by him only of the Wareham trucks; that on December 6th, Wareham delivered 9 loads to the other stock pile station and that on December 7, 1956, Wareham trucks delivered 8 loads plus "whatever the vendor was." He further testified that there were records of deliveries other than the 74 loads he definitely kept records on but that such deliveries were turned over and that there could have been more than 74 loads during this period. Weaver testified that he was unable to make out the first material delivery record, form 2140, and that he gave the delivery slips from the stock piles to Fait and requested him to make out the first form. Thereafter, Weaver made out his own forms. This testimony also disclosed that defendant Fait was on a hunting trip when these first deliveries were made and delivery slips received and that upon his return Fait made up the 2140 form from delivery slips handed to him by Weaver. When he and

Fait signed this form, he, Weaver, was satisfied that the cinders represented thereon had been delivered. Just how, in view of this evidence, Fait was supposed to have signed false and fraudulent form 2140 records has not been disclosed by either this witness or any other Commonwealth witness.

In connection with the audit conducted by Mellman on these deliveries, he testified that he used only the actual records furnished by Weaver as contained in his little book to arrive at the shortage claimed by the Commonwealth. If other records were available, he did not consider these in arriving at the alleged shortage.

The testimony relied upon to sustain the verdict against Petrosky came primarily from Ankney. In addition to what has been referred to heretofore, evidence was produced to show that six months after the dates set forth in the two 2140 forms in question and several months after payment was actually made and received by Ankney, Petrosky asked one of his employes, James G. Lattimer, to change the original truck drivers' delivery slips by having him sign new forms as weighmaster.[1] While conceding that such changes were improper and done under somewhat suspicious circumstances, such new slips could have had no bearing on any charge of fraudulent pretenses since the original slips were submitted to the Greensburg office of the State Highways Department on December 21, 1956. Neither could such evidence sustain the charge of conspiracy in view of the unequivocal testimony of Brahosky and Weaver that they had not seen these later delivery slips and that form 2140 was not made up from these slips but was made from the original de-

---

[1] These delivery slips at the time were not required to be submitted to Harrisburg as part of the documents required for payment, and the Commonwealth did not nor could have relied on such slips in making payment.

livery slips in their possession at the time. Such forms were signed by defendants Sell and Fait *at that time* and not subsequent to the rewriting of the delivery slips.

The testimony of the Commonwealth, brought out under cross-examination, disclosed that when all the forms 2140 were compiled as against the invoices submitted by Petrosky, the deliveries totalled the 8076.15 tons for which a check was issued to Ankney. There was no evidence presented which disclosed any short deliveries except as testified to by Mellman, the auditor, who stated that based upon the records he examined or was instructed to examine, the shortage contended for by the Commonwealth was indicated.

Such testimony as here produced fell far short of the evidence necessary to sustain conviction beyond a reasonable doubt. The false or fraudulent pretense is predicated on two allegedly false invoices submitted by Petrosky on billheads of Ankney but there was no evidence produced to show in what respect these invoices were fraudulent. It is admitted by the Commonwealth that neither Sell nor Fait either prepared or presented these invoices. There was no evidence, except suspicion or surmise, that the forms 2140 signed by Fait or Sell were in fact false or that either Fait or Sell knew they were false. Such convictions based upon suspicion or surmise cannot stand. *Commonwealth v. McSorley,* supra.

Criminal intent may be inferred by the jury from facts and circumstances which are of such nature as to prove defendants' guilt beyond a reasonable doubt. *Commonwealth v. Kloiber,* 378 Pa. 412, 106 A. 2d 820; *Commonwealth v. Homeyer,* 373 Pa. 150, 94 A. 2d 743. Guilt must be proved and not conjectured. The reasonable inference of guilt must be based on facts and conditions proved and not on surmise. *Commonwealth v. Bausewine,* 354 Pa. 35, 46 A. 2d 491. The only cir-

cumstance which in any way connects Fait and Sell to the crimes charged is the signing of two forms 2140. This, of course, was normal procedure and no corrupt motive may be inferred from this act alone. The inference of guilt contended for by the Commonwealth could be drawn equally in favor of the defendants. Where two mutually inconsistent inferences can be drawn from the same set of circumstances, a jury may not be permitted to guess what inference it will adopt, especially where one of two guesses will deprive a defendant of his liberty. *Commonwealth v. New*, 354 Pa. 188, 47 A. 2d 450.

The elements of the offense of conspiracy are: (1) a combination of two or more persons; (2) with criminal intent or corrupt motive; (3) to do a criminal or unlawful act, or an act not itself unlawful, by criminal or unlawful means. *Commonwealth .v. Kirk*, 141 Pa. Superior Ct. 123, 14 A. 2d 914. I cannot find that sufficient evidence was produced to make out these elements.

I would sustain the objection to jurisdiction and I would grant the motions in arrest of judgment. Basic legal principles cannot be stretched to a point where they become meaningless simply on the desire to convict. I consider the majority decision as the path toward misconstruction of those principles of law we have considered as settled.

---

DISSENTING OPINION BY WATKINS, J.:

I join in the dissent of Judge GUNTHER but would add that the decision of the majority in this case fulfills the prediction made in my dissenting opinion in *Com. v. Rogers*, 187 Pa. Superior Ct. 471, 485, 144 A. 2d 662 (1958), "The majority rely on the authority of the opinion in Com. v. Prep, 186 Pa. Superior Ct. 442,

142 A. 2d 460 (1958). I believe this to be an unfortunate opinion and represents sheer judicial legislation, . . . . However, I do not believe any overt act of conspiracy was committed by the defendant in the Prep case or by the appellants in this case, in Dauphin County. *The extension of the Prep decision to this case most certainly establishes the doctrine that in any case involving an agency or instrumentality of the Commonwealth, where a conspiracy is charged, venue will lie in Dauphin County.*" (Emphasis the writer's.)

Here, the majority extends its reasoning beyond the *Prep* and *Rogers* cases so that the law that the locus of the crime is always in issue and that a court has no jurisdiction of the offense unless committed in the county where tried, *Com. v. Tarsnane*, 170 Pa. Superior Ct. 265, 85 A. 2d 606 (1952), no longer has validity.

---

DISSENTING OPINION BY MONTGOMERY, J.:

I join in the dissenting opinion of Judge GUNTHER because I can not agree with the theory relied on by the majority that presumed agencies may be tacked on ad infinitum as a means or justification for transferring these cases to Dauphin County from Westmoreland County, where everything, including payment, occurred. There is no evidence that Petrosky, Sell, or Fait ever constituted the Dauphin County Postmaster or Ankney as his or their agents. Payment was not made to Petrosky in Dauphin County but in Westmoreland; and, furthermore, there is no evidence that Sell or Fait were ever paid anything anywhere.

I join in the dissent also for the reason that there is no evidence, direct or circumstantial, from which Fait or Sell can be charged with any criminal intent, an important ingredient in the crimes charged against them.

I would dismiss these actions because of lack of jurisdiction or venue in the Court of Quarter Sessions of Dauphin County.