## Commonwealth v. Plevel and Katsafanas

*Henry G. Barr, James West,* Deputy Attorney
Generals for the Commonwealth.
*Thomas Ceraso,* for Plevel.
*Thomas Livingston,* for Katsafanas.

LIPSITT, *J.*, February 19, 1982 — On April 24, 1980, the Pennsylvania Daily Number Game experienced a fix, which rhymed with six, and in the course of events six persons were arrested and convicted.[1] The present proceedings concern the offenses alleged to have been committed by the defendants, Edward Plevel and Nicholas Katsafanas a/k/a Nick Perry (hereinafter referred to as Perry). Plevel was the security or supervising officer at the drawing for the Lottery Bureau. Perry was the announcer, employed from the beginning of the Daily Number Game in 1977 to emcee the statewide televised drawing at station WTAE, Pittsburgh. Plevel and Perry were charged with conspiracy, theft by deception, rigging a publicly exhibited contest, criminal mischief and perjury.[2]

On December 17, 1980, Judge Levy Anderson, Supervising Judge of the Multi-County Investigating Grand Jury, entered an order directing Dauphin County to be the forum for conducting the trials arising out of criminal charges related to the April 24, 1980, lottery drawing and filed pursuant to the recommendation contained in the Presentment of the Grand Jury. After pretrial motions were set aside, the cases came to trial on May 11, 1981. A Dauphin County jury returned guilty verdicts on the aforesaid charges. Motions for new trial and in arrest of judgment were timely submitted by both parties, and arguments were heard by the Dauphin County Court sitting en banc. These motions are now before the court for disposition.

The several informations aver the above two defendants, together with Peter and Jack Maragos,

---

1. Two other persons were arrested but their prosecution was not pursued.

2. Plevel was acquitted of an additional charge of "unsworn falsification to authorities."

Fred Luman, Joseph Bock and others, participated in the alleged rigging of the Daily Number Game by tampering with the ping-pong balls utilized during the drawing in such a manner as to preclude any number except four or six from being drawn in each of the three machines. Thereafter, the defendants, or others acting in their behalf, purchased lottery tickets from the Bureau of State Lotteries through retail vendors on each of the eight possible three-digit combinations of the numbers four and six and subsequently redeemed, or caused other persons to redeem, those "winning" tickets which bore the number "666."

The conspiracy information details overt acts which occurred in numerous counties throughout the Commonwealth of Pennsylvania. One of these overt acts is set forth as follows:

"On April 24, 1980 Edward Plevel, acting as the Lottery drawing official, instructed Michael Keyser that the number '666' was official thereby causing Keyser to enter said number into the Lottery Computer System in Harrisburg, which in turn had the effect of requiring the Computer System in Harrisburg to honor the redemption of any ticket bearing the number '666' for the April 24, 1980 Daily Number Game drawing."

The perjury charge stems from the allegedly false testimony by each of defendants when called before a session of the Multi-County Investigating Grand Jury in Philadelphia, Pa., and questioned on knowledge of or participation in said rigging.

The trial record is voluminous. A precis may be given of the material facts favorable to the Commonwealth as the verdict winner. Commonwealth v. Williams, 468 Pa. 357, 362 A.2d 244 (1976). Further reference will be made to the evidence in connection with the specific points in question. Essen-

tially the record substantiates the informations and shows that from sometime in February of 1980 until April of 1980, Nick Perry and Edward Plevel, together with Fred Luman, Joseph Bock, Peter Maragos and Jack Maragos, were engaged in various acts and pursued modes of conduct aimed at the substitution of counterfeit balls for official lottery ping-pong balls to enable the outcome of the Daily Number Game to be predetermined. The arrangement excluded the possibility of any numbers except four or six from being selected in each of the three machines being used at the April 24, 1980, drawing.

Normal security procedures were circumvented and the machines and balls to be used at the said drawing were left unattended for approximately 30 minutes following their selection, testing and preparation. A final practice normally conducted immediately prior to the official drawing was not held. The persons above named purchased tickets for themselves and/or enlisted other persons to purchase lottery tickets on their behalf from Daily Number lottery sales agents in each of the eight possible three-digit combinations of numbers four and six. Defendants also recruited friends or business associates to redeem the tickets.

More specifically the evidence disclosed that Perry initially contacted Peter and Jack Maragos and remained in communication with them to report the progress being made in the scheme. Peter Maragos and Jack Maragos testified to the many contacts and conversations which they had with Perry and recounted at length the methods employed to purchase and redeem lottery tickets. In April Perry borrowed a sensitive set of scales from Jack Maragos to be used by Joseph Bock, who weighted the prepared ping-pong balls by the injection of white latex paint

and affixed numbers and lettering to match those appearing on the official balls. In addition to the scales, Perry provided Bock with the hypodermic needle needed for the weighting. Fred Luman, a stagehand, substituted the eight weighted balls and participated in practice runs with weighted balls for the lottery machines.

Both Joseph Bock and Fred Luman testified relative to Plevel's activities, which evaded customary procedures and thereby prevented the contest from being conducted in accord with the rules and regulations governing the operation of the lottery. The ordinary routine was for senior citizens who were to participate in the lottery drawing to report early to the television studio in order to run through a simulated drawing. A "final" practice was generally conducted sometime after 6:30 pm. Edward Plevel was responsible for the supervision of the practices, as well as the lottery machines, and indeed there was testimony from Plevel that the machines were under his supervision and within his presence during all relevent times. Before the Grand Jury he testified a final practice was conducted after 6:30 pm. In truth the machines were unattended for approximately 30 minutes and the "final" practice was not held.

Plevel's testimony regarding the "final" practice was refuted by two senior citizens who were participants in the drawing activities on April 24, 1980. They indicated the practice was completed after 6:00 pm and they then left the studio room and returned at approximately 6:45 pm. No additional practice drawing occurred when they arrived back in the studio. The ping-pong balls were already being arranged in the machines for the live drawing which took place at approximately 6:59 pm.

Michael Keyser, a Commonwealth witness who

served as administrative officer for the Daily Number Control Section of the Bureau of State Lotteries, testified to the procedure utilized in designating the winning ticket number, and it was through his testimony the jury learned Plevel instructed him that the number "666" was official. Keyser then entered the number into the lottery computer system in Dauphin County.

Testimony offered by other officials of the Bureau of State Lotteries explained that any lottery ticket purchased from a lottery sales agent, no matter where located within the Commonwealth, is actually issued or caused to be issued by a computer physically located in Dauphin County, Pa. The sales agent feeds information to the computer and this computer then assigns an individual serial number to a transaction and records the time and date. It also transmits instructions to the terminal located at the site of the sales agent.

Video tapes of the drawing in question were submitted to the Federal Bureau of Investigation Laboratory in Washington, D.C. The tapes were reviewed and 16 millimeter movie films were made of the event of the 24th and those on different dates. Other exhibits were prepared by the FBI and comparisons made of the drawing which took place on April 24, 1980, with other drawings which occurred during the immediate month. An FBI expert testified, making actual frame by frame comparisons, graphically illustrating how the ping-pong balls numbered 0, 1, 2, 3, 5, 7, 8, 9 in each of the three drawing machines exhibited a diminished level of activity and failed to achieve the same mobility on days prior and subsequent to the 24th. The explanation for the disparity in movement was the addition of the weight to the balls on April 24.

The Commonwealth produced considerable and exhaustive evidence. There was proof beyond any reasonable doubt that these defendants had perpetrated the misdeeds virtually as the Commonwealth claimed. A fragile challenge was voiced to the sufficiency of the proof against defendant Plevel on the charges of theft by deception and criminal mischief, wherein the Commonwealth asserted, inter alia, that Plevel had either purchased or caused others to purchase lottery tickets on his behalf and thereafter redeemed certain of the tickets; however, upon examination of the record there was definite testimony by witnesses, in particular Dominick Marinucci, to contradict Plevel's contention.

Marinucci, a Commonwealth witness, said he operated a newsstand with a Daily Number Game outlet in Scottsdale, Pa. Plevel was his district manager for the State lottery during the period in question and came into the store on the morning of April 24 to purchase $80 worth of tickets in all eight possible combinations of four and six. While Plevel had purchased tickets prior thereto, this wager was the largest he had made. After the drawing Plevel told the witness the tickets were not his, and he would arrange to send somebody to pick up the winnings. A clerk for Marinucci testified a person later came into the store and received the cash for the tickets. In the late summer or early fall of 1980, Marinucci was approached by Plevel and told if anyone, such as a policeman, came into the store and asked about the tickets, Marinucci was to say a woman bought the tickets and cashed them. On this occasion, according to Marinucci, Plevel said he had come in a truck because he thought he was being followed.

Plevel also has questioned the sufficiency of the evidence on the perjury counts because on cross examination, the two senior citizens who told of their

experiences at the time of the drawing were confused, but, of course, the direct examination could be and obviously was accepted as true by the jury. Plevel has argued further that the information on the rigging charge recited the wrong provision under 18 Pa.C.S.A. §4109. Under subsection (c) it is acknowledged he could have been a participant if the testimony of Luman and Bock disclosed Plevel knew the lottery was not being conducted in compliance with the governing rules, but it is urged that subsection (a) referred to in the information would require actual presence when the act occurred. The act provides as follows:

"(a) Offense defined.—A person commits a misdemeanor of the first degree if, with intent to prevent a publicly exhibited contest from being conducted in accordance with the rules and usages purporting to govern it, he:

(1) confers or offers or agrees to confer any benefit upon, or threatens any injury to a participant, official or other person associated with the contest or exhibition; or

(2) tampers with any person, animal or thing.

(b) Soliciting or accepting benefit for rigging.—A person commits a misdemeanor of the first degree if he knowingly solicits, accepts or agrees to accept any benefit the giving of which would be criminal under subsection (a) of this section.

(c) Participating in rigged contest.—A person commits a misdemeanor of the first degree if he knowingly engages in, sponsors, produces, judges, or otherwise participates in a publicly exhibited contest knowing that the contest is not being conducted in compliance with the rules and usages purporting to govern it, by reason of conduct which would be criminal under this section."

This reasoning is without merit because Plevel's nonpresence when he should have been in attendance was an affirmative act invoking tampering. Nor should his conversations with Luman as to the appropriate time for the artifice be overlooked.

With these observations as to the certainty of the substantive evidence off our chest, attention may be directed to each of the procedural and quasi-constitutional issues advanced by the defendants, which areas demand earnest deliberation.

The principal ground for error is the contention that venue and jurisdiction do not lie in Dauphin County because the Commonwealth failed to prove the alleged criminal acts occurred in Dauphin County, where the trial was held and the parties were convicted. Defendants argue subject matter jurisdiction of criminal courts in Pennsylvania extends only to offenses committed within the county of trial. They point to the provision in Article I, Section 9 of the Constitution of the Commonwealth, which states:

"In all criminal prosecutions the accused hath a right to . . . in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage. . . ."

And thus it is urged a court has no jurisdiction of an offense unless committed in the county where tried, for the Constitution has been so interpreted in numerous appellate cases. See, e.g., Commonwealth ex rel. Chatary v. Nailon, 416 Pa. 280, 206 A.2d 43 (1965).

Relative to the conspiracy charge reference is made to Commonwealth v. Creamer, 236 Pa. Super. 168, 172, 345 A.2d 212, 214 (1975). In a situation entailing an indictment for obstruction of justice and conspiracy with a state police officer, the court said:

"Moreover, we do not agree with the Commonwealth that a person may be tried for obstruction of justice where the alleged effect occurred. The 'tracing' of crimes has not been adopted in this Commonwealth. . . ."

Defendants assert that, at best, any tie to Dauphin County was an accessory or incidental act and not an act essential to any crime. And, the argument goes on, even if Dauphin County had jurisdiction for the conspiracy charge, other substantive offenses cannot be piggybacked. On the substantive counts of theft by deception and criminal mischief, 18 Pa.C.S.A. §§3922 and 3304, defendants say the locus for any fraud depends on where the thing of value was obtained.

On the counts charging violation of the statutory provision entitled "rigging publicly exhibited contest," 18 Pa.C.S.A. §4109(a), defendants point out the lottery drawing took place in Allegheny County and the statute only forbids participation in such a contest. Moreover, defendants contend the holding in Commonwealth v. Creamer, supra, would preclude jurisdiction in a county where merely the effect of the rigging was felt. On the perjury charges, both defendants vehemently argue there is nothing in the law which would permit the trial in Dauphin County because the subject testimony was given before a Grand Jury sitting in Philadelphia.

While all of these arguments have a modicum of logic, none can prevail. Defendants' positions were rejected preliminarily and are again rejected. The conspiracy involved here spread across many counties throughout the Commonwealth. Because of the location of the computer system for the Pennsylvania state lottery within Dauphin County, this County is the one judicial district within the Commonwealth where at least one overt act came to pass in

connection with the theft by deception, criminal mischief, rigging and conspiracy charges. See Commonwealth v. Petrosky, 194 Pa. Super. 94, 166 A.2d 682 (1960). In addition to the testimony reflecting that activity takes place in Dauphin County in every instance in which a lottery ticket is either sold or redeemed, the conspiracy information also alleges Edward Plevel, acting as the lottery drawing official, caused Michael Keyser to enter the number "666" into the lottery computer system in Harrisburg.

Pursuant to the statutory authority vested in him in accordance with his appointment as Supervising Judge of the September 24, 1979, Multi-County Investigating Grand Jury, Judge Levy Anderson of the Court of Common Pleas of Philadelphia County directed the criminal proceedings against the defendants to be held in Dauphin County. The authority to enter this order was based upon the provisions of the Investigating Grand Jury Act, now found at 42 Pa.C.S.A. §4551(d) which state:

"In any case where a multi-county investigating grand jury returns a presentment the supervising judge shall select the county for conducting the trial from among those counties having jurisdiction."

A review of the presentments upon which the charges in the instant case are based, together with an examination of the informations which have been filed, compels a conclusion that Judge Anderson did not abuse his discretion in directing the trials arising out of the undertakings of these defendants, together with co-defendants, to be held in Dauphin County. In addition to the specific legislative provision giving Judge Anderson the authority to designate the county for conducting the trial in the instant case, the facts set forth establish that venue properly does lie in Dauphin County.

The current situation is not unlike that in Petrosky, supra, wherein defendants were tried and convicted in Dauphin County for charging fraudulent prices to the Department of Highways located in Harrisburg. Yet the materials involved were delivered to and for use in Westmoreland County. The Petrosky Court commented on the jurisdictional issue as follows:

"It is also well settled that prosecution for a criminal conspiracy may be brought in the county where the unlawful combination or confederacy was formed, or in any county where an overt act was committed by any of the conspirators in furtherance of that unlawful combination or confederacy. Com. v. Prep, supra, 186 Pa. Superior Ct. 442, 450, 142 A.2d 460; Com. v. Mezick, 147 Pa. Superior Ct. 410, 413, 24 A.2d 762. We said in the Prep case (page 451 of 186 Pa. Superior Ct., page 465 of 142 A.2d): 'It is a well established theory of the law that, where one puts in force an agency for the commission of crime, he, in legal contemplation, accompanies the same to the point where it becomes effectual; . . .'
. . . ."

194 Pa. Super. at 102, 166 A.2d at 687. Here, at least one overt act took place in Dauphin County, and the jury so found with adequate facts to support its verdicts.

The jurisdiction of Dauphin County on the perjury counts necessitates distinct examination. This issue was also raised by the defendants prior to trial and disposed of by this court in reliance on the previously discussed statutory provisions vesting selection power in the Grand Jury Supervising Judge. The former decision on the correctness of holding trial in Dauphin County is reiterated. If venue was proper on the other substantive counts as it has been determined it was, the perjury committed be-

fore the Grand Jury was so intertwined with the substantive offenses as to require a joinder. Any connection between Philadelphia and the perjured testimony occurred simply because of the fortuitous choice of the physical situs of the Grand Jury.[3]

Examination of the Investigating Grand Jury Act, 42 Pa. C.S.A. §4541 et seq., reveals the purpose of convening a Multi-County Investigating Grand Jury having statewide jurisdiction is to fill a void in the Pennsylvania prosecutorial effort and to facilitate the investigation of complex multi-county organized crime and public corruption. To give support to the defendants' contentions would frustrate this purpose by requiring such investigations to be subsequently fragmented into numerous county trials with the concomitant strain on judicial and prosecutorial resources.

Traditional county lines have been disregarded in legislatively created venue provisions aimed at judicial economy, which enactments have found favor with the Pennsylvania Courts. See, e.g., Commonwealth v. Ruby, 240 Pa. Super. 377, 367 A.2d 1100 (1976). Accordingly, in view of the statewide repercussions of defendants' criminal activities and the attendant meretriciousness regarding these activities, the court again declines to accept the attacks on venue and jurisdiction.

The court is also obliged to address anew its prior refusal to sever the trial so as to try each count of the informations separately and to try each defendant

---

3. Actually, no Philadelphia residents sat on the Grand Jury which heard the perjured testimony. Under the facts of this case, even if the purpose of venue is to assure a cross section of the community (or vicinage) in which the crime occurred, virtually every citizen of the Commonwealth would be eligible to serve on the Grand Jury.

separately. Pursuant to Pa.R.Crim.P. 228(d), severance is discretionary, and case law holds the decision of the trial judge reversible "only . . . for a manifest abuse of discretion or a showing of prejudice and clear injustice to the defendant." Commonwealth v. Rose, 265 Pa. Super. 159, 175, 401 A.2d 1148, 1157 (1979).

A number of cases, including Rose, have treated the standard for joinder of offenses. In Commonwealth v. Rhodes, 250 Pa. Super. 210, 378 A.2d 901 (1977), the Superior Court held the test of whether consolidation of informations or indictments is proper relates to whether evidence of one crime would be admissible at trial of the other offense and whether the facts and elements of the individual crimes are easily separable in the minds of the jury. Both Rose, supra, and Commonwealth v. Lasch, 464 Pa. 573, 347 A.2d 690 (1975) (an equally divided court) emphasize that when various crimes share a common nexus, joinder is proper.

In the instant case, all of the changes involve defendants' role in planning and rigging the April 24, 1980, drawing of the Pennsylvania Daily Number Game and purchasing and redeeming tickets in order to profit through this criminal conspiracy. Evidence relating to each of the individual charges would be admissible at a trial for the other charges. The perjured Grand Jury testimony would also be admissible as false exculpatory statements of the defendants. The proof in support of the perjury charges would be the identical evidence offered by the Commonwealth to establish the underlying criminal offenses. Accordingly, no valid reason exists to show an abuse of discretion by the Court in refusing to pave the way for a series of time-consuming, unnecessary separate trials.

On the problem of severance of the trial of each defendant, a myriad of Pennsylvania appellate cases supports the proposition that defendants charged with conspiracy generally should be tried together. See, e.g., Commonwealth v. Schwartz, 210 Pa. Super. 360, 233 A.2d 904 (1967), aff'd. 432 Pa. 522, 248 A.2d 506 (1968); Commonwealth v. Evans, 190 Pa. Super. 179, 154 A.2d 57 (1959), aff'd. 399 Pa. 387, 160 A.2d 407 (1960); Commonwealth v. Sindel, 205 Pa. Super. 355, 208 A.2d 894 (1965). Moreover, the court in Commonwealth v. Kloiber, 378 Pa. 412, 106 A.2d 820 (1954), ruled a joint trial is permissible, if not advisable, when the crimes charged grow out of the same acts and much of the same evidence is necessary or applicable to both defendants.

Defendant Plevel has presented a rather novel argument with respect to Peter Maragos' testimony about statements defendant Perry made to Maragos, which statements implicated Plevel as an active participant in the lottery rigging scheme. Plevel asserts nothing in the testimony shows he knew Perry was negotiating with either of the Maragos brothers. In essence, Plevel is laboring on the premise that two separate conspiracies existed and that Plevel had nothing to do with any agreement between Perry and the Maragos brothers. It is a plausible rationale but not in accord with the Commonwealth's theory or the evidence, which vindicated the Commonwealth's information that all the parties participated together in one conspiracy.

Additionally, the law is settled that once a defendant's participation in a conspiracy has been established, declarations of a co-conspirator are admissible if made during the course of and in furtherance of the conspiracy. See, e.g., Commonwealth v. Tervalon, 463 Pa. 581, 345 A.2d 673 (1975); Com-

monwealth v. Horvath, 187 Pa. Super. 206, 144 A.2d 489 (1958). In the instant case, the Commonwealth presented proof Plevel purchased tickets for the April 24, 1980 lottery drawing in the combinations required to "win," as the security officer participated in dispensing with the normal "final practice" for the drawing in question, attempted to mislead the authorities on the purchase and redemption of tickets and made false statements before the Multi-County Investigating Grand Jury. With this clear confirmation of defendant's involvement in the conspiracy, the admission of statements made by a co-conspirator during the course of and in furtherance of the conspiracy was not improper.

A case specifically appertaining to joinder of defendants in a perjury trial is Commonwealth v. Weitkamp, 255 Pa. Super. 305, 386 A.2d 1014 (1978), where perjury charges were brought against two separate defendants based upon allegedly false testimony presented before the Pennsylvania Crime Commission. Although defendants had testified on separate occasions during Commission hearings and had not been charged with subornation of perjury or conspiracy to commit perjury, the court found their joinder at trial was not erroneous since the evidence indicated the defendants had participated in a common scheme or enterprise and evidence of the underlying factual basis necessary to prove the falsity of defendants' testimony came from a closely related group of individuals.

As a further aspect of the severance issue, Plevel has argued the pretrial ruling by the court to try defendants together led to a situation which prevented his calling defendant Perry to the stand. Counsel for Perry objected to Plevel's request to call Perry as a witness and the court sustained the objection. In addition, Plevel's counsel was precluded from com-

menting to the jury on Perry's failure to take the stand.

This issue of co-defendant testimony is concededly a perplexing one not yet fully resolved by the courts. Under the guidelines enunciated in the applicable case law, however, severance was not mandated in the present situation, as it was, for example, in DeLuna v. United States, 308 F.2d 140 (5th Cir. 1962).

Careful scrutiny of the DeLuna case, particularly its factual setting, reinforces this position. The finding in DeLuna was summarized as follows: "If an attorney's duty to his client should require him to draw the jury's attention to the possible inference of guilt from a co-defendant's silence, the trial judge's duty is to order that the defendants be tried separately." Id. at 141. That conclusion stemmed from the joint trial of two defendants, Gomez and DeLuna, for federal drug law violations. Both had been riding in Gomez's car and as police approached the vehicle, Gomez had thrown out a package, which was confiscated and found to contain narcotics.

At trial Gomez testified and attempted to place the blame squarely on DeLuna by saying DeLuna gave him the package and instructed him to dispose of it. Gomez said he was unaware of the contents. Unlike the present case, Gomez did not seek to put DeLuna on the stand. Gomez's counsel, however commented in closing on the failure of DeLuna to take the stand, and the trial judge was unable to eradicate the potential harmful effects of counsel's remarks. As the DeLuna court stated "[T]he joint trial. . . put Justice to the task of simultaneously facing in opposite directions. And Justice is not Janus-faced." Id. at 143.

Further insight into this testimonial dilemma is provided in United States v. Panetta, 436 F.Supp. 114 (E.D. Pa. 1977). In Panetta two defendants, a licensed gun dealer and his felon customer, were tried jointly for conspiracy and firearms-related offenses. Following conviction Panetta alleged the court's refusal to sever the trial was error because it precluded him from calling his co-defendant Diana to the stand to seek exculpatory testimony. In upholding the conviction, the court said:

". . . The general rule is that defendants jointly indicted should be jointly tried. United States v. Kulp, 365 F.Supp. 747,765 (E.D.Pa. 1973), aff'd mem., 497 F.2d 921,922 (3d Cir. 1974). A defendant seeking severance bears the burden of clearly showing that severe prejudice will result from a joint trial. United States v. Frumento, supra, 409 F.Supp. at 144-45; see United States v. Lipowitz, 407 F.2d 597, 601-02 n. 15 (3d Cir.) cert. denied, 395 U.S. 946, 89 S.Ct. 2026, 23 L.Ed. 2d 466 (1969). Since a defendant cannot compel his untried co-defendant to testify regardless of whether they are tried jointly or separately, United States v. Barber, 442 F.2d 517, 529 n. 22 (3d Cir.), cert. denied, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed 2d 275 (1971), in order to obtain a severance on this basis Panetta was required to show both that Diana would testify voluntarily if a joint trial were not held and the significance of such testimony to the defense. Frumento, supra, 409 F.Supp. at 145. Here Panetta failed to satisfy even the threshold requirement of showing that Diana would testify at all if a severance were granted." Id. at 126.

The court was also unpersuaded by Panetta's argument that severance should have been granted so that his counsel could have called Diana as a witness, forced him to invoke his fifth amendment

privilege and then commented thereon to the jury. In that regard the judge observed as follows:

". . . [T]here was no showing that Panetta's inability to comment would result in real prejudice to his defense. United States v. Somers, 496 F.2d 723, 731 (3d Cir.) cert. denied, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed 2d 58 (1974). Unlike DeLuna v. United States, 308 F.2d 140 (5th Cir. 1962), the interests of the co-defendants here were not mutually exclusive. See Somers, supra; United States v. Addonizio, 451 F.2d 49, 62-63 (3d Cir.), cert. denied, 405 U.S. 936, 92 S. Ct. 949, 30 L.Ed.2d 812 (1972); United States v. Kahn, 381 F.2d 824, 840 (7th Cir.), cert. denied, 389 U.S. 1015, 88 S.Ct. 591,19 L.Ed. 2d 661 (1967). Indeed because of the seller-buyer relationship between Diana and Panetta, adverse comment on the former's failure to testify would have served only to hurt Panetta rather than help him. Cf. United States v. Carella, 411 F.2d 729, 731-32 (2d Cir.) cert. denied sub nom., Erhart v. United States, 396 U.S. 860, 90 S.Ct. 131, 24 L.Ed. 2d 112 (1969)." Id. at 128.

More on point with the present case than DeLuna are some of the cases discussed therein, particularly United States v. Housing Foundation of America, 176 F.2d 665 (3d Cir. 1949). In that case a defendant was compelled to testify over his continuing objection as part of his co-defendant's case. The conviction was reversed and a new trial ordered, even though the trial judge had ruled that the examination should not continue, had it stricken from the record and gave a cautionary instruction to the jury. The court's disquisition was that "[t]he plain difference between the privilege of witness and accused is that the latter may not be required to take the stand at all." Id. at 666.

The interface between this principal and the holding in DeLuna, supra, on severance was discussed at length in United States v. Addonizio, 451 F.2d 49 (3d Cir. 1972), a case cited approvingly in Panetta, supra. The Addonizio court considered in some detail circumstances under which a defendant might suffer prejudice from his inability to comment upon a co-defendant's failure to testify.

". . . Addonizio contends that failure to grant him a severance, at least after he had testified, deprived him of his right to argue to the jury in closing that, while he had freely taken the stand and denied his guilt, his co-defendants had failed to do so. Addonizio cites DeLuna v. United States, 308 F.2d 140 (5th Cir. 1962), which clearly supports his position that a severance was required. However, we share the concern expressed by Circuit Judge Bell in his concurrence in DeLuna. Discussing the right of the co-defendant Gomez' right to comment upon DeLuna's failure to take the stand, Judge Bell stated:

". . . If Gomez, or others similarly situated, claims the right which the majority holds that he has to comment on the failure of DeLuna to testify, a mistrial will be required at the instance of his co-defendant who did not take the stand. In addition, severance in advance of trial may be required where there is a representation to the court that one co-defendant does not expect to take the stand while another or others do expect to testify, and claim their right to comment upon the failure of the other to testify. This would eliminate joint trials, or vest in a defendant the right to a mistrial during final arguments, or in the alternative create built-in reversible error, all in the discretion of the defendants.' DeLuna at 156

Judge Bell concluded that a defendant has no right to comment upon a co-defendant's failure to take the stand. We hesitate to go so far. Rather, we believe the better rule was stated by Chief Judge Hastings in United States v. Kahn, 381 F.2d 824, 840 (7th Cir. 1967):

'The question as we see it is *how essential is it to a fair and complete defense, an attribute of a fair trial, that defendants be permitted to comment upon a co-defendant's exercise of his right against self-incrimination.* The procedural difficulties and the complication of joint trials arising from the rule suggested by dicta in DeLuna are so great that we cannot say there is an absolute right, without reference to the circumstances of defense at trial, for a defendant to comment on the refusal of a co-defendant to testify. We think there must be more to justify the disintegration of a trial, such as a conspiracy trial in which there is a cohesion of crime alleged, defendants charged, and proof adduced. *There must be a showing that real prejudice will result from the defendant's inability to comment.*' (Emphasis supplied)" Id. at 62-63.

In the present case, the defenses of Perry and Plevel were neither antagonistic nor mutually exclusive. No real prejudice, therefore, emanated from Plevel's inability to call Perry as a witness or comment upon his silence.

Plevel's final ground for error is based upon the Commonwealth attorney's cross examination of Plevel. A series of questions concerned whether Plevel knew of a business partner and a close social friend, both of whom had purchased lottery tickets for the April 24 drawing. Plevel's counsel objected contending the questions were beyond the scope of direct examination and enabled the jury to draw an

improper inference, but the court overruled the objection.

Plevel's response was he had learned sometime during the investigation that these persons had purchased tickets in the winning combinations, but he denied any direction to purchase from him. Discussion occurred at sidebar on the evidence the Commonwealth had on Plevel's connection with these two parties. Plevel now claims this evidence should have been produced. In any event, the court's ruling permitted the questioning and while it may not have been necessary for the case against Plevel, it was certainly proper cross examination within the framework of the charges against Plevel, who denied knowing about or participating in the crimes at issue. Certainly areas of inquiry tending to contradict his assertions were appropriate on cross examination and assisted the jury in credibility determinations.

Defendant Perry has raised several points for error independent of Plevel. First, Perry has argued the court erred in the instructions to the jury. Perry contends the court erroneously broadened the information on conspiracy by referring to an overt act not charged in the information and also advised the jury in terms of the statute allegedly violated instead of the specific language of the allegations in the information. He cites Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270 (1960), in which the United States Supreme Court held a defendant has a substantial and basic right to be tried only on charges presented in an indictment.

During instructions to the jury and in connection with the defendant Perry's point for charge, which the court gave in the exact wording requested, the court went on by way of clarification to refer to the testimony by Donald Frank, Director of Administra-

tion for the Bureau of State Lotteries, regarding the operation in Dauphin County whenever lottery tickets were purchased or redeemed. Surely this reference to Frank's testimony in no way amended or varied the charges set forth in the information. In Perry's objection to the reading of a section of the statute on criminal mischief in answering a question posed by the jury, he asserts the jury must be limited to the allegations in the information. The information had been read to the jury; therefore, reading the applicable statutory provision on which the information was based could not in any sense be error.

Next Perry asserts the court erred by refusing to instruct the jury on the appropriate standard of evaluating accomplice exculpatory testimony and, therefore, violated the holding in Cool v. United States, 409 U.S. 100, 93 S.Ct. 354 (1972). In Cool, the Supreme Court held exculpatory testimony of an accomplice need only be proven by a fair preponderance of the evidence in order to raise a reasonable doubt. Here, it is argued Plevel furnished significant exculpatory testimony as to Perry, and the court refused Perry's requested charge on this point.

This court is cognizant of the Cool principle and did not disregard it. The court actually gave the authorized accomplice charge and limited it to the four prosecution witnesses who gave incriminating testimony implicating defendants. It did not, by its terms, have any application to Plevel. The jury was instructed specifically and on numerous occasions that it was the Commonwealth's burden to prove defendants' guilt beyond a reasonable doubt.

The court's instruction held the prosecution's witnesses subject to the corrupt source accomplice criterion and allowed the defense witnesses, including

co-defendant Plevel, to be judged by historic credibility considerations. These instructions were the most favorable possible jury guidelines available to the defendant. The instruction tendered by defense counsel, if given, would have interjected confusion and ambiguity into the court's charge. Perhaps more important, Plevel's testimony was hardly exculpatory for Perry, but rather to the effect he was without knowledge of Perry's involvement. Such testimony would not entitle Perry to an instruction which would over-emphasize the impact of Plevel's testimony or Perry's defense.

The additional errors advanced by defendant Perry are not deemed of such significance to merit detailed review of the law. Perry claims the Court should have allowed his counsel to present a rebuttal argument to the jury as permitted in the federal system. This is not the procedure in the state courts. See Rule 1116(b) of the Pennsylvania Rules of Criminal Procedure.

Additionally, Perry asserts error in the denial of a mistrial motion made during the Commonwealth's closing argument to the jury. In closing, the prosecutor used the words "we know that was a lie" or similar language in referring to certain Grand Jury testimony by defendants. Perry claims the comments were expressions of personal belief bearing on the veracity of the testimony and thus prejudicial to the point of denying him a fair trial. Since neither defense counsel requested the closing arguments to be transcribed, the exact words used are not known. The court, however, heard the remark and stated on the record its view that in the context in which it was presented the comment was not a personal opinion.

Defense counsel appeared to have overreacted. The prosecutor covered the facts and testimony at

length and asked the jurors to convict if they believed the testimony offered by the Commonwealth. Moreover, the prosecutor himself, after the denial of the objection at sidebar, went on to tell the jury his argument reflected no personal opinion.

Perry further urges the Court erred in restraining his counsel's attempt to elicit impeaching testimony from the Commonwealth witness, Peter Maragos. Perry's attorney asked a series of questions seeking to determine if Peter Maragos had any animosity toward Perry. One inquiry was whether Maragos had refused to be interviewed by him in the presence of Maragos' lawyer. An objection was sustained. The defense insists this question was intended to demonstrate bias or prejudice and thus was proper. The Court regards such a question as irrelevant and one that could not conceivably be crucial to the outcome of the trial. If there was any error, it was harmless.

Finally, Perry says the court made a misjudgment by refusing to dismiss the information because the statutes allegedly violated are unconstitutionally vague as applied under the circumstances of the instant case. The statutes in the court's judgment are explicit enough in defining the proscribed conduct. Any extended discussion on the law pertinent to unconstitutional vagueness would probably serve to engulf this deliberation with obscurities not necessary for this disposition.

The legislation creating the Multi-County Investigating Grand Jury is comparatively recent and as the foregoing examination of the testimony discloses, difficulties exist, singularly those of a procedural nature. Defendants are seeking absolutes impossible to attain in any trial because lawyers and judges — at least trial judges — are fallible. One may contemplate the cynicism of Mark Twain "Man

was made at the end of the week when God was tired."

The facts of this case are not complicated and the existence of a multiplicity of legal issues does not make a fair trial unobtainable. This court is satisfied a fair trial was held and defendants' rights were fully protected by the authorities whose duty to society is to effectuate the corrective measures justice requires.

Accordingly, we enter the following

## ORDER

And now, February 19, 1982, the motions for a new trial and in arrest of judgment submitted on behalf of the defendants, Edward Plevel and Nicholas Katsafanas a/k/a Nick Perry, are denied and the attorney general is directed to call the defendants for sentencing.